UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:13-cv-00231-JAW |
| | ) | |
| SCHWAN'S HOME SERVICE, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this wage and hour action, Michael Smith claims that his former employer, Schwan's Home Service, Inc. (Schwan's), violated federal and state law by failing to pay him overtime. In view of the vigorously disputed record, the Court concludes that under Federal Rule of Civil Procedure 56, there are genuine disputes of material fact that require jury resolution, and denies Schwan's motion for summary judgment.

## I.     STATEMENT OF FACTS

### A.     Procedural History

On June 19, 2013, Michael Smith filed a complaint against Schwan's, alleging that Schwan's violated the Maine overtime statute, 26 M.R.S. § 664, and the federal Fair Labor Standards Act, 29 U.S.C. § 207, and that Schwan's has been unjustly enriched. *Compl.* (ECF No. 1). On October 30, 2013, Schwan's answered the Complaint, denying its essential allegations and asserting several affirmative defenses. *Def.'s Answer to Pl.'s Compl.* (ECF No. 7). On January 9, 2014, Schwan's filed an amended answer. *Def.'s First Am. Answer to Pl.'s Compl.* (ECF No. 19).

On May 29, 2014, Schwan's filed a motion for summary judgment with a supporting statement of material facts. *Def.'s Mot. for Summ. J.* (ECF No. 25) (*Def.'s Mot.*); *Separate Statement of Uncontroverted Facts* (ECF No. 26) (DSMF). Mr. Smith responded to Schwan's motion and its statement of material facts, and filed a statement of additional material facts on June 19, 2014. *Pl. Michael Smith's Resp. to Def.'s Mot. for Summ. J.* (ECF No. 31) (*Pl.'s Opp'n*); *Pl.'s Opp'n to Def.'s Statement of Material Facts* (ECF No. 32) (PRDSMF); *Pl.'s Statement of Additional Material Facts* (ECF No. 32) (PSAMF). On July 3, 2014, Schwan's filed a reply to Mr. Smith's response and to his statement of additional material facts. *Schwan's Home Serv., Inc.'s Reply Mem. of Points and Authority in Further Support of its Mot. for Summ. J.* (ECF No. 34) (*Def.'s Reply*); *Schwan's Home Serv., Inc.'s Reply Statement of Uncontroverted Facts in Further Support of its Mot. for Summ. J.* (ECF No. 35); *Def.'s Resps. to Pl.'s Statement of Additional Material Facts* (ECF No. 35) (DRPSAMF).[1]

---

[1] As noted above, on July 3, 2014, Schwan's filed a pleading entitled, "Schwan's Home Service, Inc.'s Reply Statement of Uncontroverted Facts in Further Support of its Motion for Summary Judgment." (ECF No. 35). Consistent with the provisions of Local Rule 56(d), this pleading contains Schwan's replies to Mr. Smith's statement of additional material facts, located under the heading entitled, "Defendant's Responses to Plaintiff's Statement of Additional Material Facts." D. ME. LOC. R. 56(d) ("A party replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts submitted by the opposing party. The reply statement shall admit, deny or qualify such additional facts . . . .").

However, in an unusual move, Schwan's also replied to Mr. Smith's responses to its original statement of material facts. For example, Schwan's reply to Mr. Smith's response to paragraph 4 of Schwan's statement of material fact reads:

> 4. They are responsible for "daily management and operation of the warehouse facility . . . and safety, warehouse maintenance, and employee safety."
>
> **Plaintiff's Response: Denied. Facility Supervisors were not responsible for the daily management and operation of Schwan's Gorham facility, as this was the Location General Manager's ("LGN") responsibility.** *Meier Dec.* ¶ 16, *DeRosie Dec.* ¶ 18.

## B. Factual Background[2]

### 1. General Background regarding Schwan's Shared Services, LLC and Schwan's Home Service, Inc.

#### a. Schwan's Shared Services, LLC

Schwan's Shared Services, LLC (Shared Services) assists in maintaining a "Driver Qualification File" on employees working in positions subject to the United States Department of Transportation (DOT) regulations. DSMF ¶ 27; PRDSMF ¶ 27. The "Facility Supervisor" position for Schwan's is subject to DOT regulations. *Id.*

Shared Services continuously monitors driving information, hours of service records, Medical Examination Card renewals, as well as reviews and audits "Driver Qualification Files" of drivers, manages DOT-required drug and alcohol testing, and

---

**Defendant's Reply: Qualified. The declaration testimony of Mr. Meier and Mr. DeRosie directly contradicts Plaintiff's own deposition testimony and statements that he made to his current employer that he ". . . effectively managed the warehouse including billing, vendors and maintenance . . ." Smith Dep. Ex. 59. Plaintiff admitted that this statement of duties was accurate as to Plaintiff's work for Schwan's. Smith Dep. 176:7-24.**

The Local Rules do not allow the moving party to reply to the non-movant's responses to the movant's original statement of material facts. Under the Local Rules, the moving party has the obligation to set forth its statement of material facts with record support. D. ME. LOC. R. 56(b) ("Each fact asserted in the statement . . . shall be supported by a record citation as required by subsection (f) of this rule"). The opposing party is required to "admit, deny or qualify the facts by reference to each numbered paragraph . . . and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule." *Id.* 56(c). If the opposing party does not admit the statement, the Court reviews the record support for the parties' positions and resolves whether to accept the statement or credit the denial or qualified response. The Local Rules do not give the movant an opportunity to weigh in as to whether the non-movant's responses were to its liking. As Schwan's replies to Mr. Smith's responses are not allowed under the Local Rules, the Court strikes them. The Court STRIKES paragraphs 1 through 48 on pages 1 through the top of page 17 in Schwan's Reply Statement (ECF No. 35); the Court has considered Schwan's responses to Mr. Smith's statement of additional material facts from pages 17 through 42, as that filing is consistent with the Local Rules.

[2] In accordance with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to Mr. Smith's case theories consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). In compliance with this obligation, the Court recites supported facts as true even if Schwan's disputes them.

assists in the investigation of non-compliance with DOT regulations and the imposition of discipline for any violations. *Id.*[3]

### b. Schwan's Home Service, Inc.

#### i. The Manufacturing and "Caselots" Process

Since at least 1990, Schwan's food products have been manufactured in at least seven states, and it owns each of the manufacturing facilities in these states. DSMF ¶ 28; PRDSMF ¶ 28. Schwan's generally obtains immediate title to all food products manufactured by it, whereas it obtains title to all food products manufactured by co-packers when it takes delivery at the manufacturing site or at one of its distribution centers. DSMF ¶ 29; PRDSMF ¶ 29. After obtaining title, Schwan's retains title until the product is delivered to its customer. *Id.*

The food products are shipped in "caselots"—large shipping containers of numerous individual sales units—to its distribution centers in various locations, and then to hundreds of depots across the continental United States via "long-haul, over-the-road trucks." DSMF ¶ 30; PRDSMF ¶ 30. Upon arrival at a depot, these caselots are broken down and loaded onto smaller delivery trucks. DSMF ¶ 31; PRDSMF ¶ 31. This process of loading and unloading is performed by a Material Handler under

---

[3]     Mr. Smith admitted Schwan's paragraph 27 "solely for purposes of summary judgment" in accordance with Local Rule 56(g). PRDSMF ¶ 27. It is admitted. *See* D. ME. LOC. R. 56(g) ("Facts deemed admitted solely for purposes of summary judgment shall not be deemed admitted for purposes other than determining whether summary judgment is appropriate"). In his admissions to a number of Schwan's paragraphs, Mr. Smith noted that he was making the admission solely for the purpose of the motion and the Court accepts this qualification for each response in which it was raised. *See id.*
        Similarly, in its admissions to a number of Mr. Smith's paragraphs, Schwan's noted that it was making the admission solely for the purpose of the motion and the Court accepts this qualification for each response in which it was raised. *See id.*

the supervision of a Facility Supervisor.  *Id.*[4]  These products are then stored at the

depot until delivered to customers.  DSMF ¶¶ 32-33; PRDSMF ¶¶ 32-33.

### ii.    The Delivery Process and the Delivery Trucks

When Schwan's products travel in interstate commerce to reach customers,

Schwan's does not use long-haul, over-the-road trucks to deliver the products from

the distribution centers directly to individual consumers due to safety and efficiency

concerns.  DSMF ¶¶ 34-35; PRDSMF ¶¶ 34-35.  The delivery trucks have a gross

vehicle weight rating (GVWR) in excess of 10,001 pounds, meaning that the vehicles

are subject to the requirements of the DOT's Federal Motor Carrier Safety

Regulations (FMCSR).  DSMF ¶ 36; PRDSMF ¶ 36.

### iii.    Facility Supervisors' Duties and Responsibilities under the FMCSR and DOT

Because Facility Supervisors at Schwan's must operate commercial motor

vehicles, they must follow the requirements set forth under the FMCSR.  DSMF ¶ 37;

---

[4]     Mr. Smith denied the following part of Schwan's paragraph 31: "This loading and unloading is performed by a Material Handler under the supervision of a Facility Supervisor."  DSMF ¶ 31. Schwan's cites and quotes the declaration of Colleen Thompson, a Corporate Compliance Manager at Shared Services, who notes that she has "personal first-hand knowledge."  *Def.'s Mot.* Attach. 1 *Decl. of Colleen Thompson in Support of Def.'s Mot. for Summ. J.* ¶¶ 1-2, 5 (*Thompson Decl.*).  Mr. Smith counters by suggesting that this was not the "primary function" of a Facility Supervisor, and further states that "first and foremost Mr. Meier expected Plaintiff to work alongside his material handlers to make sure that all of the loads for Schwan's trucks were manually removed from the freezer and loaded onto the trucks in a timely manner, and to otherwise perform the manual labor necessary to ensure that the trucks were properly inventoried, fueled and serviced."  PRDSMF ¶ 31 (citing *Aff. of Thomas L. Douglas, Esq.* Attach. 3 *Decl. of Robert Meier* ¶¶ 5-6 (ECF No. 33) (*Meier Decl.*); *id.* Attach. 2 *Decl. of Michael Smith* ¶ 13 (*Smith Decl.*)).

Mr. Smith's record citations do not contradict Schwan's paragraph 31.  Schwan's paragraph 31 does not assert that supervision of the Material Handler is the Facility Supervisor's primary or secondary function, just that the Facility Supervisor supervises the Material Handler's loading and unloading.  What Mr. Meier expected "first and foremost" from Mr. Smith does not create a factual dispute over Schwan's paragraph 31.  In fact, it may support it.  The Court overrules Mr. Smith's denial.

PRDSMF ¶ 37. These requirements include: (1) an annual "Certification of Compliance"; (2) a DOT medical examination occurring every two years or at the interval established by the medical examiner, which may be less than every two years based on a medical condition; (3) passing a DOT road test; and (4) performing daily post and pre-trip-required vehicle inspections. *Id.*[5]

During the course of operating DOT-regulated commercial motor vehicles, Facility Supervisors must travel to and from the fleet maintenance provider, shuttling product as well as the vehicles themselves among depots and/or to the "Route Sales Representatives" in the field. DSMF ¶ 38; PRDSMF ¶ 38.

The following documents were found in Mr. Smith's personnel file, evidencing the DOT's regulation of him: (1) Request and Consent for Information on Alcohol Testing, Drug Testing and Vehicle Accident History from Schwan's Application for Employment; (2) January 2007 Certificate of Violations; (3) December 2007 Certificate of Violations; (4) December 2008 Certificate of Violations; (5) December

---

[5]    Schwan's paragraph 37 originally stated that it also requires its Facility Supervisors to "maintain[] hours of service records as established under U.S. DOT regulations." DSMF ¶ 37. However, Mr. Smith interposed a qualified response to this part of Schwan's paragraph 37:

> When Mr. Meier supervised Plaintiff in his capacity as Facility Supervisor, to Mr. Meier's recollection Plaintiff never kept a log of the time he spent driving Schwan's delivery vehicles, nor did Plaintiff input his time on the DOT handheld devices used by Schwan's regular drivers. Bill DeRosie also never kept a log of the time he spent driving these vehicles, nor did Bill input his time on the DOT handheld devices. By contrast, Schwan's regular drivers were required to input time into these DOT handheld devices.

PRDSMF ¶ 37 (citing *Meier Decl.* ¶ 18; *Aff. of Thomas L. Douglas, Esq.* Attach. 4 *Decl. of William J. DeRosie* ¶ 23 (*DeRosie Decl.*)). The Court is required to view all the evidence in the light most hospitable to, and resolve factual disputes in favor of, the non-moving party. *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). So viewed, the record evidence controverts this part of Schwan's paragraph 37. The Court has not included it in the recitation of facts.

2009 Certificate of Violations; (6) December 2010 Certification of Violations; (7) 2007 Medical Examiner's Certificate sign-off for DOT positions; (8) 2009 Medical Examiner's Certificate sign-off for DOT positions; (9) 2007 Fleet Safety Policies and Procedures Acknowledgment Sign-Off; (10) 2007 Certificate of Road Test; and (11) Substance Abuse Awareness Training for DOT Compliance. DSMF ¶ 47; PRDSMF ¶ 47.

### iv.     Schwan's and the DOT

Schwan's has complied with DOT regulations concerning qualifications and hours of service for its Facility Supervisors, as well as safety for its vehicles, since its creation over 60 years ago. DSMF ¶ 39; PRDSMF ¶ 39. In addition, the DOT issued Schwan's an operating certificate with a motor carrier fleet number. DSMF ¶ 40; PRDSMF ¶ 40. If Schwan's did not comply with DOT regulations, the DOT would have the power to withdraw Schwan's fleet number and shut down the company's interstate operations if it believed the company was non-compliant. DSMF ¶ 41; PRDSMF ¶ 41.

In 1994, Schwan's requested an opinion from the DOT as to whether Schwan's operations are governed by the FMCSR. DSMF ¶ 42; PRDSMF ¶ 42. The facts set forth in Schwan's letter to the DOT have not materially changed since it was written. DSMF ¶ 43; PRDSMF ¶ 43. In June 1994, the DOT responded with its opinion, expressly notifying Schwan's that it was subject to DOT and Federal Highway Administration jurisdiction. DSMF ¶ 44; PRDSMF ¶ 44.[6] Schwan's has been subject

---

[6]     Schwan's paragraph 45 states: "Schwan's requires, as a condition of employment, that Facility Supervisors meet all of the above-referenced U.S. Department of Transportation regulatory

to various audits and reviews to ensure regulatory compliance, including on-site reviews, depot audits, and ongoing road side inspections.  DSMF ¶ 48; PRDSMF ¶ 48.

### 2.    The "Position Description": The Duties and Responsibilities of a Facility Supervisor at Schwan's Home Service, Inc.

According to the "Position Description," Facility Supervisors are supposed to execute the "company's Good Warehouse Practices (GWP) and follow[] any government regulations concerning EPA, OSHA, all food safety regulations, and other safety-related regulations, as specified in the company's manual."  PSAMF ¶ 20; DRPSAMF ¶ 20; DSMF ¶ 3; PRDSMF ¶ 3.[7]  Facility Supervisors are also responsible for "proper product handling (depot sales under $3,000,000 annually) and safety, warehouse maintenance and employee safety," which falls under the umbrella

---

requirements."  DSMF ¶ 45 (citing *Thompson Decl.* ¶¶ 10, 15).  Mr. Smith denied Schwan's paragraph 45 for the same reasons set forth in his qualified response to paragraph 37.  PRDSMF ¶ 45; *see supra* note 5.  Viewed in the light most favorable to Mr. Smith, the record evidence controverts Schwan's paragraph 45; specifically, Schwan's assertion that it requires its Facility Supervisors meet "all" of the DOT regulations.  The Court has not included Schwan's paragraph 45.

Similarly, Schwan's paragraph 46 states: "Plaintiff was likewise expected to meet all of these regulatory requirements."  DSMF ¶ 46.  Mr. Smith denied Schwan's paragraph 46 for the same reasons set forth in his qualified response to paragraph 37.  PRDSMF ¶ 46; *see supra* note 5.  Viewed in the light most favorable to Mr. Smith, the record evidence controverts Schwan's paragraph 46; specifically, Schwan's assertion that Mr. Smith was required to meet "all" of the DOT regulations.  The Court has not included Schwan's paragraph 46.

[7]    Schwan's paragraph 3 states: "A Facility Supervisor is responsible for executing Schwan's 'Good Warehouse Practices' and ensuring compliance with government regulations concerning EPA, OSHA, all food safety regulations and other safety-related regulations."  DSMF ¶ 3.  Mr. Smith denied paragraph 3.  PRDSMF ¶ 3 (citing *Aff. of Thomas L. Douglas, Esq.* Attach. 1 *Dep. of Michael Smith* 184:13-186:22 (*Smith Dep.*); *Meier Decl.* ¶¶ 16-17; *DeRosie Decl.* ¶¶ 18-19).  The record evidence cited by Mr. Smith, viewed in the light most favorable to him, suggests that neither he nor Mr. DeRosie (another Facility Supervisor) was responsible for carrying out Schwan's "Good Warehouse Practices" or other regulations.  However, Schwan's cites the "Position Description" of a Facility Supervisor for its assertion, which contains nearly identical language to its paragraph 3.  *See Def.'s Mot.* Attach. 5 at 3 (*Position Description*).  The Court adjusted Schwan's paragraph 3 by quoting the language from the Position Description, and deems the paragraph, as altered, admitted.

of "daily management and operation of the warehouse facility within Schwan's GWP Guidelines." PSAMF ¶ 20; DRPSAMF ¶ 20; DSMF ¶ 4; PRDSMF ¶ 4.[8]

Additional duties of a Facility Supervisor include hiring, training, supervising, and managing the performance of the Material Handlers who carry out warehouse operation duties, as well as scheduling Material Handlers' hours. DSMF ¶ 5; PRDSMF ¶ 5. The Position Description also includes the duty to "manage designated fleet management responsibilities which includes maintaining DOT compliance files, communicating with truck maintenance provider, vehicle registration and license, and periodic fleet safety inspections." PSAMF ¶ 30; DRPSAMF ¶ 30; DSMF ¶ 6; PRDSMF ¶ 6.[9] The Position Description also specifically states that a Facility Supervisor "[m]ust meet the Federal [DOT] eligibility requirements, including appropriate driver's license and corresponding medical certification as a condition of

---

[8] Schwan's paragraph 4 states: "They [Facility Supervisors] are responsible for 'daily management and operation of the warehouse facility . . . and safety, warehouse maintenance, and employee safety.'" DSMF ¶ 4 (quoting *Position Description*). Mr. Smith denied that Facility Supervisors were responsible for the daily management and operation of Schwan's Gorham facility. PRDSMF ¶ 4 (citing *Meier Decl.* ¶ 16; *DeRosie Decl.* ¶ 18). The Court reviewed the record citations provided by Mr. Smith, and aside from stating that the Position Description indicates that Facility Supervisors are responsible for the daily management and operation of the warehouse facility, *see Position Description*, the Court finds that Schwan's paragraph 4 is supported by the record. The remainder of Schwan's paragraph 4 is deemed admitted because it was not properly controverted by Mr. Smith. *See* D. ME. LOC. R. 56(f).

[9] Mr. Smith interposed a qualified response to Schwan's paragraph 6, stating that "[i]n general, the Facility Supervisor position was not required to maintain Schwan's records to ensure compliance with federal, state and local regulatory agencies." PRDSMF ¶ 6 (citing *Meier Decl.* ¶¶ 16-17; *DeRosie Decl.* ¶¶ 18-19). Mr. Meier stated that Mr. Smith "did not maintain 'DOT compliance files' for Schwan. In addition, as Facility Supervisor he was not required to maintain Schwan's records to ensure compliance with federal, state and local regulatory agencies." *Meier Decl.* ¶ 16. Mr. DeRosie also stated from his own personal experience as a Facility Supervisor that he did not maintain records to ensure compliance with federal, state and local regulatory agencies. *DeRosie Decl.* ¶ 18. The Court does not view these record citations as supporting the factual contention that "in general," a Facility Supervisor was not required to maintain records to ensure compliance with regulatory agencies. The Position Description, which Schwan's recites nearly verbatim in its paragraph 6, suggests that a Facility Supervisor would have these responsibilities. Aside from including that this description comes from the Position Description, the Court overrules Mr. Smith's qualified response.

employment for the position." DSMF ¶ 7; PRDSMF ¶ 7. Schwan's requires both its Facility Supervisors and its Material Handler IIIs to be DOT-certified. PSAMF ¶ 29 DRPSAMF ¶ 29.

The responsibilities of a Facility Supervisor, as stated in the Position Description, were in effect during Mr. Smith's employment in that position. DSMF ¶ 7; PRDSMF ¶ 7. Mr. Smith acknowledged that the Position Description was "fairly accurate" as to the job duties that he performed in that role. DSMF ¶ 8; PRDSMF ¶ 8. During his deposition, Mr. Smith addressed the tasks listed in the Position Description:

BY ATTORNEY DOUGLAS:

**Q**:      I want you to pull out Exhibit 10 and have a look at it. Exhibit 10 is the job description for facility supervisor?
**A**:      Yes.
**Q**:      And I just want to ask you a few questions about some of the duties and responsibilities on that sheet. If you look under that field, duties and responsibilities, about a third of the way down the page, you will see in that first paragraph it says: Executes the company's good warehouse practices. Do you know what Schwan's good warehouse practices are?
**A**:      Not specifically. They – they didn't have that term when I was there or we possibly called it something else. We had the walk-throughs that we did and things like that, but the term doesn't ring a bell.
**Q**:      Okay. So fair to say, as you sit here right now, you don't recall anything that was termed good warehouse practices?
**MR. RUPE**:          Object.
**A**:      Correct.
**MR. RUPE**:          Leading.

BY ATTORNEY DOUGLAS:

**Q**:      That's fine. Your answer?
**A**:      Correct.
**Q**:      Did you ever receive any training from Schwan's with respect to EPA regulations?

**A**:     No.

**Q**:     Did you ever receive any training from Schwan's with respect to OSHA regulations?

**A**:     No.

**Q**:     Did you ever receive any training from Schwan's with respect to food safety regulations?

**A**:     I didn't receive any formal training, but we had the general knowledge of the temperatures and things like that of food safety.  There was no formal - - no training but it was just common knowledge.

**Q**:     Okay.  And with respect to the EPA and OSHA, prior to your employment at Schwan's had you ever received training in those areas before?

**A**:     At Hannaford we had - - they went over some OSHA things about bleach and ammonia.  They had damage bins at each end of the warehouse, not to mix the two, and then obviously steel toes.

**Q**:     What about the EPA?

**A**:     No.  We were just told at the depot that we couldn't wash the Schwan's trucks in the parking lot for the runoff.  That was the only EPA instance we had there.

. . .

BY ATTORNEY RUPE:

**Q**:     Where were the OSHA logs kept?

**A**:     I don't know.  Probably in the office on the shelf somewhere.

**Q**:     Did you ever tend to the OSHA logs, make any additions to them, write in your own handwriting in them?

**A**:     I don't recall, no.  We had the MSDS sheets and I had pest control logs that I filled out and temperature sheets, but I don't recall any OSHA logs.

**Q**:     Those other things that you just listed, where were those items located?

**A**:     In the office.

**Q**:     And were you responsible for those?

**A**:     Yes.

**Q**:     And when you had your own office they were in your office, right?

**A**:     Correct.

**Q**:     What's HPPCA?

**A**:     Has-ip (Phonetic).

**Q**:     Did you keep any records on that?

**A**:     I believe we had to fill out a sheet, everybody had to sign.

**Q**:     Okay.  And you were responsible for that?

**A**:     Yes.

PSAMF ¶ 21; DRPSAMF ¶ 21.[10]

### 3. Michael Smith's Employment Duties and Responsibilities at Schwan's Home Service, Inc.

#### a. Employment History

Mr. Smith worked for Schwan's in Gorham, Maine from December 12, 2004 through February 19, 2011. PSAMF ¶ 32; DRPSAMF ¶ 32. He was originally hired as a "Material Handler I" and promoted to "Material Handler II" on January 25, 2006. *Id.* He was promoted again on January 7, 2007 to "Material Handler III." *Id.* In 2005, Mr. Smith's gross pay was $31,603.69; in 2006, $36,018.43; and in 2007, through June 9, 2007, $19,682.59. PSAMF ¶ 33; DRPSAMF ¶ 33.

---

[10] Quoting long passages from depositions contravenes Local Rule 56, which requires that each statement of material fact be "short and concise." D. ME. LOC. R. 56(d). "Local Rule 56 was designed to halt the former summary judgment practice of submitting a voluminous record and leaving to the court the duty to comb the record in search of material facts." *Ricci v. Applebee's Ne., Inc.*, 297 F. Supp. 2d 311, 321 (D. Me. 2003). This deposition passage—as well as others that Mr. Smith has proposed—contains a number of assertions that he should have distilled into statements of discreet material facts. Despite the fact that it violates the Local Rule, the Court has considered this passage in the absence of any objection by Schwan's and the Court does not wish to affect the substantive rights of the parties on a procedural issue; nevertheless, the Court hopes that the parties and others do not get the impression that they may ignore with impunity the provisions of Local Rule 56.

In response, Schwan's admitted that Mr. Smith "so testified at his deposition." DRPSAMF ¶ 21. Schwan's also interposed a qualified response on the basis that Mr. Smith provided additional deposition testimony relevant to his paragraph 21. *Id.* (citing *Smith Dep.* 191:25-192:25). The Court included this additional testimony under the rule of completeness. *See* FED. R. EVID. 106.

Mr. Smith's paragraph 22 states: "In general, the Facility Supervisor position was not required to maintain Schwan's records to ensure compliance with federal, state and local regulatory agencies, for making sure that Schwan's employees followed the company's 'Good Warehouse Practices' or to ensure that Schwan's employees followed any applicable government regulations regarding the operation of the Gorham facility." PSAMF ¶ 22 (citing *Meier Decl.* ¶¶ 16-17; *DeRosie Decl.* ¶¶ 18-19). Schwan's denied Mr. Smith's paragraph 22 on the basis that (1) Mr. DeRosie's statements describe his personal job duties, not Mr. Smith's job duties; (2) Mr. Meier and Mr. DeRosie's statements "directly contradict[]" Mr. Smith's deposition testimony and statements made to his current employer; and (3) "the deposition testimony cited by [Mr. Smith] in support of his denial at worst demonstrates that he was unfamiliar with the term 'Good Warehouse Practices.'" DRPSAMF ¶ 22.

The Court reviewed the record citations, and does not include Mr. Smith's paragraph 22 for substantially the same reasons previously addressed. *See supra* note 9 ("The Court does not view [Mr. Smith's] record citations as supporting the factual contention that 'in general,' a Facility Supervisor was not required to maintain records to ensure compliance with regulatory agencies").

On June 1, 2007, Mr. Smith was offered the position of "Facility Supervisor I HS," and he accepted this position on June 6, 2007. PSAMF ¶ 34; DRPSAMF ¶ 34.[11] Mr. Smith worked for Schwan's as a Facility Supervisor from June 10, 2007 to February 19, 2011. DSMF ¶ 1; PRDSMF ¶ 1. During his employment in this position, he was paid on a salary basis. DSMF ¶ 26; PRDSMF ¶ 26. From June 10, 2007 through March 2, 2008, Mr. Smith was paid a salary of $37,500.00 per year. PSAMF ¶ 34; DRPSAMF ¶ 34. On March 2, 2008, he received a two percent raise to $38,250.00 per year. *Id.* Mr. Smith did not receive another raise during his employment with Schwan's. *Id.*

### b. Duties and Responsibilities as Facility Supervisor; Comparison to Material Handler Position

As a Facility Supervisor, Mr. Smith was responsible for supervising the depot Material Handlers, and coordinating the product receiving and material handling activities required to fulfill the sales activities at their assigned depot. DSMF ¶ 2; PRDSMF ¶ 2. In addition, Mr. Smith hired and trained the Material Handlers who reported to him. DSMF ¶ 9; PRDSMF ¶ 9. The only employees that Mr. Smith supervised were Material Handlers, and although technically he supervised the Material Handlers, Facility Supervisors and Material Handlers performed manual labor tasks. PSAMF ¶ 35; DRPSAMF ¶ 35.[12]

---

[11]     Mr. Smith's paragraph 34 originally stated "June 1, 2010" as the offer date, but Schwan's correctly points out that this appears to be a typographical error. DRPSAMF ¶ 34. The Court adjusted the date to June 1, 2007.

[12]     Mr. Smith's paragraph 35 states: "As Facility Supervisor, [Mr. Smith] did not supervise any Schwan employees except for Material Handlers. Although technically [Mr. Smith] supervised the Material Handlers, for the most part Facility Supervisors and Material Handlers performed the same manual labor tasks." PSAMF ¶ 35 (citing *Meier Decl.* ¶ 9). Schwan's submitted a qualified response by admitting that Mr. Smith "did not supervise any Schwan employees except for Material Handlers,"

A Facility Supervisor's primary function was to perform the manual labor necessary to load Schwan's delivery trucks with product during the overnight shift and otherwise ensure that the trucks were fueled, serviced and loaded by morning so product could be delivered to Schwan's customers. PSAMF ¶ 6; DRPSAMF ¶ 6.[13] Robert Meier, one of Mr. Smith's supervisors, expected Mr. Smith first and foremost to work alongside his Material Handlers to make sure that all of the loads for Schwan's trucks were manually removed from the freezer and loaded onto the trucks in a timely manner, and to otherwise perform the manual labor necessary to ensure the trucks were properly inventoried, fueled and serviced. PSAMF ¶ 7; DRPSAMF ¶

but denied that Facility Supervisors and Material Handlers performed the same manual labor tasks. DRPSAMF ¶ 35.

The Court reviewed the record citations and agrees with Schwan's that the record contradicts Mr. Smith's statement that "for the most part Facility Supervisors and Material Handlers performed the same manual labor tasks." As Schwan's points out, Mr. Meier noted on one of Mr. Smith's evaluations that he had discussed the need for Mr. Smith to "delegate some of the more menial tasks so he may focus more on the admin duties which he is directly responsible for," which included the need for Mr. Smith to have his Material Handlers do more of the manual work around the depot so that Mr. Smith could "spend more time in the office" performing "administrative" duties. *Def.'s Mot.* Attach. 4 *Videotaped Dep. of Michael Smith* 123:23-125:1 (*Smith Dep. II*); Ex. 37. Mr. Smith also admitted that Mr. Meier wanted him to delegate more of the manual work to the Material Handlers. DSMF ¶ 16; PRDSMF ¶ 16. However, the record does not support an inference that Mr. Smith was to have no manual labor responsibilities whatsoever. The Court adjusted Mr. Smith's paragraph 35 by removing the words "for the most part" and "the same," and is otherwise deemed, as altered, admitted.

[13] Mr. Smith's paragraph 6 states: "A Facility Supervisor's primary function at any Schwan facility was to perform the manual labor necessary to load Schwan's delivery trucks with product during the overnight shift and otherwise ensure that the trucks were fueled, serviced and loaded by morning so product could be delivered to Schwan's customers." PSAMF ¶ 6 (citing *Meier Decl.* ¶ 5). Schwan's denied Mr. Smith's paragraph 6 on the basis that it is a "legal conclusion, not a fact." DRPSAMF ¶ 6.

The Court does not consider Mr. Meier's view of the Facility Supervisor job as a "legal conclusion" as Schwan's contends. Mr. Smith's "primary function" is a mixed question of law and fact. *See Bolduc v. Nat'l Semiconductor Corp.*, 35 F. Supp. 2d 106, 114 (D. Me. 1998). However, the Court finds that Mr. Meier has not demonstrated the requisite personal knowledge to declare what the primary function is of a Facility Supervisor at "any Schwan facility." "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge." FED. R. CIV. P. 56(c)(4). He states in his declaration that he worked for Schwan's for approximately 14 years, *Meier Decl.* ¶ 2, but that does not establish that he has personal knowledge of the inner workings of all Schwan's facilities. The Court does not include this part of Mr. Smith's paragraph 6, but otherwise overrules Schwan's denial.

7.[14]  Mr. Smith also had minimal administrative duties related to loading and ensuring the trucks were ready to travel in the morning, but it was much more important to Mr. Meier that the trucks be physically loaded on time during the overnight shift to ensure delivery to customers during the daytime.  PSAMF ¶ 8; DRPSAMF ¶ 8.[15]

Generally, as Location General Manger (LGM), Mr. Meier expected Mr. Smith to spend at least 80 to 85 percent of his time (1) pulling product from the freezers; (2) loading the delivery trucks with the product pulled from the freezers; (3) cleaning the depot; (4) fueling the trucks and otherwise checking the trucks to make sure they were ready to go in the morning; and (5) performing other manual tasks around the Gorham depot.  PSAMF ¶ 9; DRPSAMF ¶ 9.  Mr. Smith estimates that he spent at least 80 percent of his time performing these non-administrative tasks.  *Id.*[16]

---

[14]     Schwan's interposed a qualified response to Mr. Smith's paragraph 7 on the basis that the "proffered declaration testimony [of Mr. Meier and Mr. Smith] directly contradicts Mr. Meier's statements during Mr. Smith's employment as admitted by Mr. Smith during his deposition." DRPSAMF ¶ 7 (citing *Smith Dep. II* 123:23-125:1; Ex. 37).  The Court reviewed the cited deposition testimony, and finds that there is no direct contradiction to Mr. Meier's statements in his declaration. *See Meier Decl.* ¶ 6.  For instance, Mr. Smith's deposition testimony suggests that Mr. Meier wanted him to reduce the amount of manual work he was performing, but it does not suggest that Mr. Meier no longer expected "first and foremost" what is described in Mr. Smith's paragraph 7.  The Court overrules Schwan's qualified response.

[15]     Schwan's interposed a qualified response to a portion of the paragraph, contending that "Mr. Meier's own statements during Mr. Smith's employment as admitted by Mr. Smith during his deposition and in response to UF 15-16 demonstrate that he believed that loading could be primarily completed by the Material Handler while Mr. Smith 'spen[t] more time in the office' performing his 'administrative' duties."  DRPSAMF ¶ 8 (citing *Smith Dep. II* 123:23-125:1; Ex. 37).  The Court is required to draw all reasonable inferences and resolve all genuine factual disputes in favor of Mr. Smith, *ATC Realty, LLC v. Town of Kingston, New Hampshire*, 303 F.3d 91, 94 (1st Cir. 2002), and having done so, finds that Mr. Smith's paragraph 8 is properly supported without contradiction.  The Court overrules Schwan's qualified response.

[16]     Schwan's "does not deny [Mr. Smith]'s estimate of time he spent performing manual tasks for purposes of summary judgment" in accordance with Local Rule 56(g).  DRPSAMF ¶ 9.  The Court deems Mr. Smith's paragraph 9 admitted.

During his deposition, Mr. Smith provided the following response regarding

the duties of the Material Handler position:

BY ATTORNEY RUPE:

**Q**:    Give us a description, if you would, of the material handler job. What was that job?
**A**:    We pulled product, loaded trucks, cleaned the depot. Anything that needed to be done around the warehouse we did it.

PSAMF ¶ 10; DRPSAMF ¶ 10. He also described his typical shift as Facility

Supervisor in response to questioning by Attorney Rupe:

**Q**:    What I would like to understand is, walk me through a typical – and I understand your answer is that there were no typical days, but give me a sense of how the day worked when you were a facility supervisor.
**A**:    I would usually get to the depot around 11 o'clock at night, and all the drivers would be back by then and they would have sent sales; go through and collect all their - - they're called RTI's. They write out what route they are running, how many days they are going to be out, any extra product they are going to want on the truck. We'd run a load sheet, and generally one of us, after we run the load sheets, we would - - one of us would start pulling, or we'd both start pulling on the freezer product, depending on how many trucks we had. One person would fuel the trucks because that took several hours when they were propane.

And then after all the loads were pulled, we were required to inventory the freezer; and then we'd start loading trucks after they had been fueled. Download all the handhelds; any cleaning that needed to be done. If the depot needed to be cleaned, we would clean.

**Q**:    By the time you cleaned the depot, what time was it generally?
**A**:    6, 7 o'clock, 8 o'clock. Jack [Higley] required that I be there [by] 8 o'clock every morning for the meeting.
**Q**:    For the pre-drive meeting with the drivers?
**A**:    Yes.
**Q**:    So you attended those meetings?
**A**:    Yes.
**Q**:    And then if you weren't unloading a semi or there wasn't some of these unusual situations you've described in this deposition, you would usually get out of there after the meeting?

**A**:     Sometimes.  Usually there is - - - drivers would want product.  I'd have to do depot-to-truck transfer, put product on their truck.  I would run some reports from time to time.  Vendors would call.  Usually the mornings were talk with vendors or do some work on the computer in the office.

**Q**:     What would you do on the computer in the office?

**A**:     I don't remember now.

**Q**:     Was that a daily function that you would do?

**A**:     Sometimes, yes.

**Q**:     In terms of filing reports or - -

**A**:     File load sheets, file DOT slips, go around and clean up after the drivers a little bit, break down - - we generate cardboard, so if we didn't have time to break it down throughout the night on the loading I would go do that because of our - - they had an overtime policy, so they would send Bill home.

**Q**:     So give me an idea after the meeting what time you would typically get out of there.

**A**:     9:30 or 10.

PSAMF ¶ 11; DRPSAMF ¶ 11.[17]  In addition, Mr. Smith testified regarding the difference between the Material Handler and Facility Supervisor positions:

**Q**:     All right.  What was the difference between the Material Handler III job and the Material Handler II job you had held?

**A**:     It was an increase in pay and a different title.

**Q**:     The same job?

**A**:     Same job.

**Q**:     You still had DOT certification?

**A**:     Yeah.

**Q**:     And then when you became a facility supervisor, your method of payment changed from hourly pay to a salary, correct?

**A**:     Yes.

**Q**:     And describe the job of facility supervisor for me.

**A**:     Not much different than a material handler.  My title changed again, had a raise, and I had more responsibility and more to do.

**Q**:     Let's start with - - we'll come to the to-do in just a second, but let's go to the responsibility.  What additional responsibility did you have as a facility supervisor?

**A**:     I had to do - - we had yearly inspections, bi-yearly inspections, and I was responsible for making sure the depot was up to spec on that and we'd do walk-arounds, try and find problems.  I had to coordinate

---

[17]     Schwan's admitted that Mr. Smith "so testified at his deposition" as recounted by Mr. Smith in accordance with Local Rule 56(g).  DRPSAMF ¶ 11.  It is admitted.

with vendors about truck maintenance or maintenance for the building, pay bills.

PSAMF ¶ 12; DRPSAMF ¶ 12.[18]

Following Mr. Smith's departure from Schwan's in February 2011, Mr. DeRosie was promoted to the position of Facility Supervisor I. PSAMF ¶ 13; DRPSAMF ¶ 13. As Facility Supervisor, Mr. DeRosie's primary responsibility was to make sure that Schwan's trucks were loaded every day—he spent the vast majority of his time attending to this task. *Id.* In this respect, Mr. DeRosie's job duties as Facility Supervisor were essentially the same as his Material Handler job duties. *Id.*[19] As a Facility Supervisor, at no time was Mr. DeRosie responsible for the daily management and operation of Schwan's Gorham facility. PSAMF ¶ 23; DRPSAMF ¶

---

[18]     Schwan's admitted that Mr. Smith "so testified at his deposition" as recounted by Mr. Smith in accordance with Local Rule 56(g). DRPSAMF ¶ 12. It is admitted.

[19]     To support his paragraph 13, Mr. Smith cites paragraphs 10 through 15 of Mr. DeRosie's declaration. PSAMF ¶ 13. Schwan's submitted a qualified response to Mr. Smith's paragraph 13:

> Mr. DeRosie's statements in Paragraphs 10-15 of his Declaration are statements about his understanding of his job duties and do not describe Mr. Smith's duties. Mr. DeRosie's statements contradict [Mr. Smith]'s own deposition testimony and statements that he made to his current employer that [Mr. Smith] "effectively managed the warehouse including billing, vendors and maintenance." Smith Dep. Ex. 59. [Mr. Smith] admitted that this statement of duties was accurate as to [his] work for Schwan's. Smith Dep. 176:7-24.

DRPSAMF ¶ 13. The Court agrees that Mr. DeRosie's statements are specific to his job duties as opposed to Mr. Smith's, but no further information needs to be added to Mr. Smith's paragraph 13 because this point is already clearly established. In addition, the Court disagrees with Schwan's contention that Mr. DeRosie's statements contradict Mr. Smith's deposition testimony and statements he made to his current employer. First, Mr. DeRosie's statements are specific to his personal experience at Schwan's, whereas Mr. Smith's deposition testimony is specific to his personal experience at Schwan's—the fact that their experiences are not identical does not make them contradictory, especially considering Mr. DeRosie's time as Facility Supervisor occurred right after Mr. Smith's departure from Schwan's. Second, Mr. DeRosie's statement that his "job duties as Facility Supervisor were essentially the same as [his] job duties as a Material Handler" refers to his prior statement that his "primary responsibility was to make sure that Schwan's trucks were loaded every day." *DeRosie Decl.* ¶ 15. This point is made clearer when he states that "[i]n this respect," his duties as Facility Supervisor were essentially the same as when he was a Material Handler. *Id.* The Court overrules Schwan's qualified response.

23.[20] During his deposition, Mr. Smith described his limited managerial duties in the warehouse:

BY MR. DOUGLAS:

**Q**:     I want to talk about the Gorham facility, okay?  You worked at the Gorham Schwan facility?
**A**:     Depot, yes.
**Q**:     Yes.  Okay.  Was there a name for the entire building?
**A**:     Depot.
**Q**:     Depot.  Okay.  That's the term that you used?
**A**:     Yes.
**Q**:     Okay, what part of the building did you work in?
**A**:     I was in the warehouse side of the building.
**Q**:     Okay.  Was there another side?
**A**:     Sales.
**Q**:     Okay.  So do I understand correctly that there is a warehouse side and a sales side?
**A**:     Correct.
**Q**:     Did you have any responsibilities in the sales side of the building?
**A**:     No.

---

[20]     Mr. Smith's paragraph 23 states: "As Facility Supervisors, at no time were Michael Smith or Bill DeRosie responsible for the daily management and operation of Schwan's Gorham facility, as this was the LGM's responsibility." PSAMF ¶ 23 (citing *Meier Decl.* ¶ 16; *DeRosie Decl.* ¶ 18).  Schwan's denied Mr. Smith's paragraph 23 on the basis that Mr. Meier and Mr. DeRosie's statements "directly contradict[] [Mr. Smith]'s own deposition testimony and statements that he made to his current employer."  DRPSAMF ¶ 23 (citing *Smith Dep.* Ex. 59; *Def.'s Mot.* Attach. 5 at 2 (referred to as "Smith Dep. 176" by Schwan's)).

The Court reviewed the record citations provided by both parties.  Beginning with Mr. DeRosie's statements, the Court disagrees with Schwan's contention that Mr. DeRosie's statements contradict Mr. Smith's deposition testimony and statements he made to his current employer.  Mr. DeRosie's statements are specific to his personal experience at Schwan's, whereas Mr. Smith's deposition testimony is specific to his personal experience at Schwan's—the fact that their experiences are not identical does not make them contradictory, especially considering Mr. DeRosie's time as Facility Supervisor occurred right after Mr. Smith's departure from Schwan's.

Turning to Mr. Meier's statements, the Court agrees with Schwan's contention.  Mr. Smith admitted that he described his duties to SYSCO to include that he "effectively managed the warehouse including billing, vendors and maintenance," DSMF ¶ 14; PRDSMF ¶ 14, and he confirmed during his deposition that such a description was accurate.  *See Smith Dep.* 33:14-23, 188:22-189:22; *Def.'s Mot.* Attach. 5 at 2.  Although Mr. Meier claims that Mr. Smith was "not responsible for the daily management and operation" of the Gorham Facility because this was Mr. Meier's job as LGM, *Meier Decl.* ¶ 16, Mr. Smith has already given clear answers to unambiguous questions during his deposition, and "he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory" with no satisfactory explanation as to why his previous testimony is no longer accurate.  *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).  The Court strikes the part of Mr. Smith's paragraph 23 addressing "Michael Smith" and that this was the "LGM's responsibility"—the paragraph is otherwise admitted.

**Q**:     So let me go back to Exhibit 59.

**A:**     This one right here?

**Q**:     Yes.  And I want to flip to page A01191, please.  It's a copy of your resume that Attorney Rupe was asking you some questions about.  Okay.  Now with respect to your employment history on this resume, as Attorney Rupe pointed out, you state in your resume that you effectively managed the warehouse including billing, vendors, and maintenance.  Now, who worked in the warehouse?

**A**:     Myself and the material handler.

**Q**:     Anybody else?

**A:**     No.

**Q**:     Okay.  Were the drivers considered part of the warehouse staff?

**A:**     No.

**Q**:     So when you say you effectively managed the warehouse, is it fair to say that you managed yourself and the material handlers and nobody else?

**A:**     Yes.

PSAMF ¶ 24; DRPSAMF ¶ 24.[21]

In addition, as Facility Supervisors, neither Mr. Smith nor Mr. DeRosie was permitted to create, alter, interpret or implement new management policies or operating practices, nor did they have the authority to deviate from Schwan's established policies and procedures without prior approval from one of their managers.  PSAMF ¶ 27; DRPSAMF ¶ 27.  Furthermore, both Mr. Smith and Mr. DeRosie were supervised by Schwan's management.  PSAMF ¶ 26; DRPSAMF ¶ 26.  Mr. Smith and Mr. DeRosie's discretion was limited in how they performed their jobs—specifically, at a minimum, Schwan's dictated which trucks were to be loaded, the time at which all trucks needed to be loaded each morning, how often the trucks

---

[21]     Schwan's admitted that Mr. Smith "so testified at his deposition" as recounted by Mr. Smith in accordance with Local Rule 56(g).  DRPSAMF ¶ 24.  It is admitted.

were to be inventoried, the manner in which the trucks were to be fueled and

maintained, and the manner in which the depot was to be maintained.  *Id.*[22]

Another aspect of Mr. Smith's job duties included conducting inventories of the

delivery trucks and the freezers where the product was kept.  PSAMF ¶ 14;

DRPSAMF ¶ 14.  Mr. Smith was responsible for tracking inventory and ensuring that

the inventory had not expired; to do this, Mr. Smith used a handheld electronic device

to print the current inventory and inventoried the trucks and freezer on location and

by hand, and when directed by his supervisor(s), he would make a transfer(s) with

respect to a specific product(s).  DSMF ¶ 10; PRDSMF ¶ 10.[23]

---

[22]  Mr. Smith's paragraph 26 states:

In performing their duties as Facility Supervisor, both Michael Smith and Bill DeRosie were tightly supervised by Schwan management.  Michael and Bill had little or no discretion with respect to the manner in which their job was to be performed.  Specifically, at a minimum Schwan dictated which trucks were to be loaded, the time at which all trucks needed to be loaded each morning, how often the trucks were to be inventoried, the manner in which the trucks were to be fueled and maintained, and the manner in which the depot was to be maintained.

PSAMF ¶ 26 (citing *Smith Decl.* ¶ 17; *Meier Decl.* ¶ 14; *DeRosie Decl.* ¶ 16).  Schwan's denied the paragraph on the basis that the "declaration testimony proffered directly contradicts [Mr. Smith]'s own deposition testimony" and nowhere in Mr. Smith's prior testimony did he indicate that he was "tightly supervised by Schwan management."  DRPSAMF ¶ 26 (citing *Smith Dep.* 189:11-14, 189:18-22; Ex. 59).

The Court reviewed the record citations.  Beginning first with whether the declarations contradict Mr. Smith's prior testimony, the Court finds no such contradiction.  Viewing the evidence in the light most favorable to Mr. Smith, the fact that Mr. Smith testified that only he and the Material Handlers worked in the warehouse, *Smith Dep.* 189:11-14, and that he managed the Material Handlers, *Smith Dep.* 189:18-22, does not automatically mean that his discretion was not limited by upper management at Schwan's.  In Mr. Smith's paragraph 27, which Schwan's admitted for purposes of summary judgment, he states that he needed to seek approval from one of his managers before deviating from established procedures and policies.  PSAMF ¶ 27; DRPSAMF ¶ 27.  In addition, Mr. Smith received a written warning and other warnings for failing to follow procedure regarding the delivery trucks, which Schwan's also admitted for purposes of summary judgment.  PSAMF ¶ 28; DRPSAMF ¶ 28.  However, the Court agrees with Schwan's to the extent that it claims the evidence does not support that Mr. Smith was "tightly" supervised.  The Court adjusted Mr. Smith's paragraph 26 by changing "tightly supervised" to "supervised" and by changing "little or no discretion" to "discretion was limited," but otherwise overrules Schwan's denial.

[23]  Schwan's paragraph 10 states: "One part of Plaintiff's responsibilities was to track inventory and ensure that the inventory was not expired.  In order to do so, Plaintiff would work in his office on

More specifically, the procedure for inventorying the delivery trucks was as follows: (1) Mr. Smith used a handheld electronic device to print the current inventory on a register tape; (2) he would then cut the register tape with scissors and bring the tape inside the truck with him; (3) using a pencil, he would mark the register tape to indicate how many items the truck contained; and (4) once every item was physically counted, he would then enter all changes into the handheld device. PSAMF ¶ 15; DRPSAMF ¶ 15. Mr. Smith was responsible for ensuring an inventory of the trucks on a monthly basis. DSMF ¶ 11; PRDSMF ¶ 11.

The procedure for inventorying the freezers was: (1) Mr. Smith printed out the current freezer inventory; and (2) he then physically inventoried the freezer item by item by walking into the freezer and taking notes as to the current status of each item

---

his computer to print out the lists and make transfers in the computer system for the products." DSMF ¶ 10 (citing *Smith Dep. II* 126:20-127:9). Mr. Smith interposed a qualified response, explaining that while he "was responsible for manually inventorying Schwan's delivery trucks and freezer . . . the inventory lists were not printed in the office or on the computer, but instead on a handheld electronic device and Plaintiff inventoried the trucks and the freezer on location and by hand." PRDSMF ¶ 10. Furthermore, Mr. Smith contends that he did not make any transfers unless directed to do so by his supervisors. *Id.*

Mr. Smith cites his deposition testimony and declaration in support of his contention. *See id.* In his declaration, Mr. Smith explains that to inventory the trucks, he "used a hand held electronic device to print the current inventory on a register tape. [He] would then cut the register tape with scissors and bring the tape inside the truck with [him]. Using a pencil, [he] would mark the register tape to indicate how many items the truck contained. Once every item was physically counted, [he] would then enter all of the changes into the hand held device." *Smith Decl.* ¶ 10. He goes on to explain a similar process for inventorying the freezer, including a physical inventory "by walking into the freezer and taking notes as to the current status of each item on the printed inventory." *Id.* ¶ 11. Based on the record citations provided by Mr. Smith, the Court finds that Mr. Smith did not "work in his office on his computer to print out the lists." The Court adjusted Schwan's paragraph 10 to reflect the procedure Mr. Smith followed when inventorying the trucks and freezer, and deems this part of the paragraph, as altered, admitted.

The Court also reviewed the deposition testimony cited by Mr. Smith, and finds that Mr. Smith did not make transfers (or "forecasts") unless instructed to do so by his supervisor(s). *See Smith Dep.* 37:20-40:21. The Court adjusted Schwan's paragraph 10 to reflect this point, and deems this part of the paragraph, as altered, admitted.

on the printed inventory. PSAMF ¶ 16; DRPSAMF ¶ 16. Mr. Smith provided

additional testimony during his deposition regarding his limited role in inventorying

product:

BY ATTORNEY RUPE:

**Q**: What was your responsibility toward the inventory, the freezer, the frozen product?
**A**: You want to specify?
**Q**: As a facility supervisor.
**A**: I was supposed to keep an accurate inventory.
**Q**: Okay. What did that entail?
**A**: Inventorying the freezer on a regular basis.
**Q**: And what happens if the inventory is not what it was supposed to be?
**A**: Describe.
**Q**: Well, were there occasions when you were a facility supervisor that you had to become involved in ordering new product or replace inventory that had been depleted?
**A**: Everything was done on a forecasting. I don't believe I did much forecasting. I think usually Jack or the other LGMs would forecast a little bit. We didn't get into forecasting much.
**Q**: I want to understand the extent to which you were involved in the process of forecasting.
**A**: It was computer generated. We had – it went out I don't know how many weeks, and it was based on our sales. So the computer would generate a demand, and it would automatically trigger a semi when something got to a certain level. So we would occasionally run out of product if we had - - a school wanted a bunch of Sunday cones and we happened to sell out of those a semi would generate, and then we would get more product. So we tried to increase cases on items that sold quickly so that we wouldn't run out, but when you get to a certain percent a semi would automatically generate based on numbers.
**Q**: Okay. What I want to understand is –
**A**: I didn't do much with forecasting.
**Q**: I understand that. And when you say to a lawyer "I didn't do much," the lawyer is going to say to you every time, "Well, I want to understand what you did do, even if it wasn't too much." So explain to me, would it be Jack would come into your office and somebody else would be in your office and you would talk about what to order? How did that work?

**A**:     Generally he could just go into the screen and increase what he wanted. On occasion, we would talk about things that - - items that would need to be increased, so I would go in and increase those items that he asked about when he was there.

**Q**:     When he wasn't there, how did it work?

**A**:     Everybody had their own style.

**Q**:     What was your style?

**MR. DOUGLAS**:     Objection to form.

**[MR. SMITH]**:     Can I finish my first - -

**MR. RUPE**:     Sure.

**A**:     Well, when Jack was there he was very - - very proactive. We would have - - they called them super weeks or big box ride days or we would have items that were on special, so we would always want to make sure that we had plenty of those. So either he would go in and increase the forecast on that, which generally happened, or if he forgot he would ask me to do it, and I would go in and change those few items. Other than that, I didn't touch the forecast.

After he was gone, generally either the LGM or Ron himself would go in and change the forecast, or if Bob Meier was there, he would talk to corporate, and they did a 20 percent increase on all product, which means they would go through corporate, I believe, to do that. And, again, I didn't have much to do with forecasting except on rare occasions. I didn't have anything to do with sales, so they left that to the sales side.

PSAMF ¶ 17; DRPSAMF ¶ 17.[24]   He was also responsible for preparing the facility for inspections, coordinating with vendors about truck maintenance or maintenance

---

[24]     Schwan's admitted that Mr. Smith "so testified at his deposition" as recounted by Mr. Smith in accordance with Local Rule 56(g). DRPSAMF ¶ 17. It is admitted.

Mr. Smith's paragraph 18 states: "As Facility Supervisor, [Mr. Smith]'s only 'fleet management' responsibilities were to fuel the delivery trucks at night, to perform the necessary routine maintenance to make sure the trucks were roadworthy or to otherwise ensure that this maintenance was performed." PSAMF ¶ 18 (citing *Meier Decl.* ¶ 10). Schwan's denied Mr. Smith's paragraph 18 on the basis that Mr. Meier's statements "directly contradict[]" Mr. Smith's deposition testimony as well as Mr. Smith's statements to his current employer. DRPSAMF ¶ 18 (citing *Def.'s Mot.* Attach. 5 at 2; *Smith Dep. II*).

The Court agrees with Schwan's. The Position Description provides that a Facility Supervisor must "[m]anage[] designated fleet management responsibilities which includes maintaining Department of Transportation (DOT) compliance files, communicating with truck maintenance provider, vehicle registration and license, and periodic fleet safety inspections." Although this description alone does not prove that Mr. Smith in fact had these responsibilities at the Gorham facility, he admitted that he had some of these responsibilities. For example, when asked during his deposition what additional responsibilities he had in his position, he stated that he was "responsible for . . . coordinat[ing] with vendors about truck maintenance." *Smith Dep.* 33:18-22. He also admitted

for the building and paying bills. DSMF ¶ 12; PRDSMF ¶ 12. All of these duties were specific to the "warehouse side of the building." *Id.*[25]

Mr. Smith also performed daily safety inspections of delivery trucks. DSMF ¶ 23; PRDSMF ¶ 23. When a delivery truck needed inspection, Mr. Smith drove the truck to the licensing city's fire department for the inspection. DSMF ¶ 22; PRDSMF ¶ 22. He also drove the trucks on an approximately weekly basis to understand driver complaints. DSMF ¶ 25; PRDSMF ¶ 25. In addition, Mr. Smith provided road tests as a field trainer to Schwan's drivers in the delivery vehicles. DSMF ¶ 24; PRDSMF ¶ 24. During his deposition, Mr. Smith described some of his "fleet management" responsibilities with respect to the maintenance of Schwan's trucks:

> **Q**: And did you perform any inspections on the vehicles?
> **A**: We did the - - - Bill and I every - - - every morning when we backed the truck in we were required - - - after a certain period of time they made it mandatory that all the facility supervisors were chair handlers, pre-trip the trucks. We'd check the oil and make sure the lights worked.
> **Q**: And when Bill wasn't there, you did that?
> **A**: Yes.
> **Q**: Give me a breakdown of how often you would do the safety inspections of the trucks.
> **A**: Every day.
> **Q**: Okay. And with regard to your safety inspections, were there times where you noticed something that was not safe and you took action?
> **A**: Yes.
> **Q**: Give me an example of the kinds of things that you would do when you would inspect the trucks and determine something was not safe.

Schwan's paragraph 13, which states that when Mr. Smith submitted an application for employment to his current employer, SYSCO, he described his duties to include "dispensing of LPG fuel, billing, driving DOT vehicles, maintain[ing] all government documents." DSMF ¶ 13; PRDSMF ¶ 13. Because the evidence does not properly support Mr. Smith's paragraph 18, the Court does not include it.

[25] Mr. Smith submitted a qualified response, stating that while there were two sections of the Gorham facility—warehouse and sales—his duties only extended to the "warehouse side." PRDSMF ¶ 12 (citing *Smith Dep.* 187:23-189:22). The Court reviewed the record citation and added this fact to paragraph 12.

**A**: If the oil was low, we would add oil. There might be a light out. We had extra parts, so we'd change a headlight or change a light like that. If we noticed a brake pedal was a little mushy, we'd send it over to Bill Dodge to have them check that out. They opened at seven, and the drivers didn't get in until eight, so we had a little time to get things fixed.

PSAMF ¶ 19; DRPSAMF ¶ 19.[26]  He also testified:

BY ATTORNEY DOUGLAS:

**Q**: Okay. You had testified about some of your - - and I'll use the term that Attorney Rupe used – fleet management responsibilities. Did those responsibilities include maintenance?
**A**: Specify maintenance?
**Q**: Yes. The upkeep of the trucks.
**A**: When we did our inspections if we found things, we would have to change them or fix them if possible. If we found anything wrong, we would send it off to the dealership to be fixed.
**Q**: Were you responsible for the drivers at Schwan's?
**A**: No.
**Q**: Did you supervise them?
**A**: No.
**Q**: Who – when you were facility supervisor, who supervised the drivers?
**A**: It was the LGM who supervised the drivers.
**Q**: You never supervised the drivers?
**A**: No. I was on the same level as they were as far as authority.

PSAMF ¶ 31; DRPSAMF ¶ 31.[27]

4.    **Michael Smith's Description to SYSCO of his Former Duties and Responsibilities as Facility Supervisor**

---

[26]    Schwan's admitted that Mr. Smith "so testified at his deposition" as recounted by Mr. Smith in accordance with Local Rule 56(g), "but notes that the quoted testimony deals only with the inspections Mr. Smith would perform and gives no indication of being an exhaustive list of all of his 'fleet management responsibilities.'"  DRPSAMF ¶ 19.  The Court included the words "some of" immediately preceding the words "his 'fleet management' responsibilities" to clarify the extent of Mr. Smith's testimony, and otherwise deems the paragraph, as altered, admitted.
[27]    Schwan's admitted that Mr. Smith "so testified at his deposition" as recounted by Mr. Smith in accordance with Local Rule 56(g).  DRPSAMF ¶ 31.  It is admitted.

When Mr. Smith submitted an application for employment to his current employer, SYSCO, he described his duties as a Facility Supervisor to include "hiring and training of new employees, inventory, pulling/loading order, dispensing of LPG fuel, billing, driving DOT vehicles, maintained all government documents." DSMF ¶ 13; PRDSMF ¶ 13. He also submitted a résumé to SYSCO, in which he indicated that his duties as a Facility Supervisor included that he "accurately filed and organized all Government Monitored Documents . . . effectively managed the warehouse including billing, vendors and maintenance . . . [and] hired, trained and managed new employees." DSMF ¶ 14; PRDSMF ¶ 14. Mr. Smith highlighted his minimal administrative responsibilities at Schwan's on his résumé because he was seeking a supervisor position at SYSCO Foods. PSAMF ¶ 25; DRPSAMF ¶ 25.[28]

### 5. Michael Smith and Bill DeRosie's Hours at Schwan's Home Service, Inc.

Mr. Smith's typical shift as a Facility Supervisor lasted from 11 p.m. until at least 9:30 or 10:00 a.m. the following day, with some shifts lasting as long as 20 hours. PSAMF ¶ 1; DRPSAMF ¶ 1. Mr. Smith kept track of his time on scraps of paper for

---

[28]     Mr. Smith cites paragraph 12 of his declaration in support of his paragraph 25. PSAMF ¶ 25. Schwan's denied Mr. Smith's paragraph 25 on the basis that his "self-serving affidavit directly contradicts his prior deposition testimony" and that Mr. Smith was "given an opportunity at [his] deposition, if it had been true, to affirmatively state that his resume was exaggerated, as he now claims. He did not do so, and cannot create a material dispute of fact by contradicting his own testimony now that [Schwan's] has filed a motion for summary judgment." DRPSAMF ¶ 25. The Court is unclear why Mr. Smith's paragraph 25 contradicts his prior deposition testimony. The declaration upon which Mr. Smith relies to support his paragraph 25 indicates that he "highlighted [his] minimal management responsibilities at Schwan because [he] was seeking a supervisor position at Sysco." *Smith Decl.* ¶ 12. Nowhere in his paragraph 25 or declaration does Mr. Smith claim that he "exaggerated" or lied about his responsibilities on his résumé as Schwan's contends. For example, Mr. Smith does not claim that the list of responsibilities was inaccurate and listed for the sole purpose that it would make him look like a better candidate for the position he sought at SYSCO. The Court overrules Schwan's denial.

several weeks, and on these occasions, his time totaled 65 to 70 hours per week. PSAMF ¶ 2; DRPSAMF ¶ 2. Mr. Meier, an LGM at the Gorham Facility and supervisor of all employees at this location (including Mr. Smith) until he left the company in 2009, observed that Mr. Smith usually worked well in excess of 45 hours per week. PSAMF ¶ 3; DRPSAMF ¶ 3.

In or around July 2007, William "Bill" DeRosie started working at the Schwan's Gorham facility as a Material Handler III; Mr. Smith was Mr. DeRosie's supervisor from July 2007 until April 2010, and again briefly in January and February 2011. PSAMF ¶¶ 4, 37; DRPSAMF ¶¶ 4, 37. Aside from a brief period in 2007, Mr. DeRosie never worked with another Material Handler while Mr. Smith was his supervisor. PSAMF ¶ 37; DRPSAMF ¶ 37. Mr. DeRosie observed that during this period Mr. Smith regularly worked more than 50 hours per week, and sometimes in excess of 60 or 70 hours per week. PSAMF ¶ 5; DRPSAMF ¶ 5. Schwan's had a "no overtime" policy in place when Mr. DeRosie was working as a Material Handler with Mr. Smith, and as a result, Mr. DeRosie was generally limited to working 40 hours per week. PSAMF ¶ 36; DRPSAMF ¶ 36. To the extent that all of the necessary work could not be performed during Mr. DeRosie's 40 hour workweek, Mr. Smith worked extra hours as necessary to finish the work. *Id.* After Mr. DeRosie became Facility Supervisor in place of Mr. Smith, Mr. DeRosie was also required to work extra hours as necessary to finish the work once his Material Handler reached 40 hours in a week. PSAMF ¶ 38; DRPSAMF ¶ 38.

According to the labor calculator used by Schwan's, in addition to Mr. Smith and one Material Handler, Schwan's should have had another employee working in the warehouse for at least 20 hours per week to complete all the work required to ensure that Schwan's delivery trucks were loaded and ready to go each morning. PSAMF ¶ 39; DRPSAMF ¶ 39.  With the exception of a brief period in 2007, Mr. Smith only had one Material Handler working for him.  PSAMF ¶ 40; DRPSAMF ¶ 40.  Also, there were several weeks in 2010 when he worked without any Material Handlers assisting him, specifically from April until the end of June and from December 11 until the termination of his employment with Schwan's.  *Id.*

      **6.**    **Michael Smith's Use of His Personal Vehicle for Schwan's Home Service, Inc.**

During his deposition, Mr. Smith testified regarding the use of his personal vehicle while working for Schwan's:

BY ATTORNEY DOUGLAS:

**Q**:    Did you use your personal vehicle while you were working for Schwan's?
**A**:    Yes.
**Q**:    How often?
**A**:    Weekly.
**Q**:    Are you certain about that?
**A**:    Yes.
**Q**:    And you were entitled to be reimbursed for your mileage –
**A**:    Yes.
**Q**:    Let me finish my question – when you used your personal vehicle?
**A**:    Yes.  We had a certain mileage rate and it increased every couple of years.
**Q**:    Did you submit your mileage weekly?
**A**:    No.
**Q**:    How often did you submit do you think?
**A**:    Every three or four weeks I would do an expense report.

> **Q**: When you were facility supervisor, what was the personal vehicle that you were using?
>
> **A**: My truck.
>
> **Q**: And what was that?
>
> **A**: It's an '07 Chevy Silverado.
>
> **Q**: Do you have any idea how much that truck weighs?
>
> **A**: Right around 7,000 pounds.

PSAMF ¶ 41; DRPSAMF ¶ 41.[29]

Based on their personal observations, both Mr. Meier and Mr. DeRosie attest that Mr. Smith frequently drove his personal vehicle to perform his job duties as Facility Supervisor. PSAMF ¶ 42; DRPSAMF ¶ 42. For example, Mr. Smith would drive for hours in his personal vehicle to meet and supply delivery drivers with food product, and he also used his personal vehicle to pull Schwan's delivery trucks out of ditches on several occasions. *Id.* Mr. Meier estimates that Mr. Smith used his personal vehicle to perform work-related tasks at least once per week during his time as Facility Supervisor, and as LGM, Mr. Meier approved the use of Mr. Smith's personal vehicle for work-related tasks, in part, because it was cheaper for the company rather than having Mr. Smith take one of the company's delivery trucks. PSAMF ¶ 43; DRPSAMF ¶ 43.

When Mr. Smith drove his personal vehicle for Schwan's, the company reimbursed him for mileage. PSAMF ¶ 44; DRPSAMF ¶ 44. To obtain reimbursement, he was required to fill out an expense reimbursement request which needed approval by Mr. Meier or another manager. *Id.* As LGM, Mr. Meier knew that Schwan's routinely approved Mr. Smith's mileage reimbursement requests. *Id.*

---

[29] Schwan's admitted that Mr. Smith "so testified at his deposition" as recounted by Mr. Smith in accordance with Local Rule 56(g). DRPSAMF ¶ 41. It is admitted.

When Mr. Meier supervised Mr. Smith in his capacity as Facility Supervisor, to his recollection, Mr. Smith never kept a log of the time he spent driving Schwan's delivery vehicles, nor did Mr. Smith input his time on the DOT handheld devices used by Schwan's regular drivers.  PSAMF ¶ 47; DRPSAMF ¶ 47.  Mr. DeRosie also never kept a log of his time spent driving these vehicles, nor did he input his time on the DOT handheld devices.  *Id.*  By contrast, Schwan's regular drivers were required to input time into these DOT handheld devices.  *Id.*[30]

The personal vehicle used by Mr. Smith to perform work-related tasks at Schwan's was a 2007 Chevy Silverado.  PSAMF ¶ 48; DRPSAMF ¶ 48.  This vehicle had a GVWR of 7,000 pounds, and was not designed or used to transport more than eight passengers, nor was it used to transport hazardous materials for Schwan's.  *Id.*  As Facility Supervisor, Mr. Smith would occasionally have to drive his personal vehicle out-of-state while performing his job duties; he could be called upon to do this at any time.  *Id.*

### a.     Bill DeRosie's Use of His Personal Vehicle for Schwan's Home Service, Inc.

When Mr. DeRosie served in the role of Facility Supervisor, he had to drive a vehicle on occasion.  PSAMF ¶ 45; DRPSAMF ¶ 45.  To the best of his recollection, he drove a company truck 50 percent of the time and his personal vehicle the other 50

---

[30]     Schwan's interposed a qualified response to Mr. Smith's paragraph 47 on the basis that the statements made by Mr. Meier and Mr. DeRosie do "not address whether Facility Supervisors, and specifically [Mr. Smith], were *required* to comply with the U.S. DOT regulations requiring the maintenance of hours of service records."  DRPSAMF ¶ 47 (emphasis in original).  To the extent Schwan's contends that the statements should not be considered because they do not address the question of compliance with DOT regulations, the Court overrules Schwan's qualified response.

percent of the time.  *Id.*  Specifically, Mr. DeRosie drove two different personal vehicles for Schwan's while employed as Facility Supervisor: (1) a 2001 Ford F-250; and (2) a 2004 Ford F-350.  *Id.*  Both vehicles weigh less than 10,000 pounds.  *Id.*[31] Although he did not keep records of the time he spent driving company trucks or his personal vehicle while at work, Mr. DeRosie's recollection is that in any week that he drove a Schwan's truck, he likely drove his personal vehicle as well.  PSAMF ¶ 46; DRPSAMF ¶ 46.[32]

### 7. Michael Smith's Feedback from his Supervisors at Schwan's Home Service, Inc.; Disciplinary Action; Resignation in 2011

Mr. Meier indicated on an employment evaluation that Mr. Smith needed to "delegate some of the more menial tasks so he may focus more on the admin duties which he is directly responsible for."  DSMF ¶ 15; PRDSMF ¶ 15.  Mr. Meier had informed Mr. Smith that the Material Handler should do more of the manual work around the depot (as opposed to administrative work), and Mr. Smith should "spend more time in the office" to perform "administrative" duties.  DSMF ¶¶ 16, 18; PRDSMF ¶¶ 16, 18.[33]

---

[31]    Schwan's admitted Mr. Smith's paragraph 45 "for purposes of summary judgment only" in accordance with Local Rule 56(g), but also noted that "this fact only represents Mr. DeRosie's personal recollections and has no bearing on Mr. Smith's job duties or experience with driving Schwan's delivery trucks."  DRPSAMF ¶ 45.  It is admitted.

[32]    Schwan's admitted Mr. Smith's paragraph 46 "for purposes of summary judgment only" in accordance with Local Rule 56(g), but also noted that "this fact only represents Mr. DeRosie's personal recollections and has no bearing on Mr. Smith's job duties or experience with driving Schwan's delivery trucks."  DRPSAMF ¶ 46.  It is admitted.

[33]    Schwan's paragraph 18 states that Mr. Smith was told by his "supervisor" to delegate more of the "non-administrative work" to the Material Handler.  DSMF ¶ 18.  The Court assumes this "supervisor" was Mr. Meier.

In another review in 2009, Jack Higley, one of Mr. Smith's supervisors at Schwan's, indicated that Mr. Smith needed to continually acquire more work from his Material Handler so that he may "pursue more administrative tasks which he is sometimes laxed [sic] and tardy." DSMF ¶ 17; PRDSMF ¶ 17.

On December 14, 2009, Mr. Smith received a written warning for failing to ensure that the trucks were inventoried on a monthly basis. DSMF ¶ 19; PRDSMF ¶ 19. Also on December 14, 2009, he received a written warning because the last delivery truck was not loaded until 9:45 a.m.; he also received warnings for failing to manually inventory the delivery trucks and for failing to fuel the delivery trucks properly. PSAMF ¶ 28; DRPSAMF ¶ 28. In January 2010, Mr. Smith was suspended for three days for failing to ensure the trucks were inventoried as part of his fleet management responsibilities. DSMF ¶ 20; PRDSMF ¶ 20. On February 19, 2011, Mr. Smith accepted Schwan's invitation to voluntarily resign. DSMF ¶ 21; PRDSMF ¶ 21.

## II.     POSITION OF THE PARTIES

### A.     Schwan's Motion

#### 1.     Classification as Exempt Employee Under Maine and Federal Law Pursuant to the Administrative Exemption

Schwan's begins by arguing that Mr. Smith was "properly classified as an exempt employee pursuant to Maine and Federal law" because his primary duty as Facility Supervisor was to perform administrative tasks. *Def.'s Mot.* at 9. Schwan's notes that under the Fair Labor Standards Act (FLSA), the overtime requirement does not apply to "'any employee employed in a bona fide executive, administrative,

or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary).'" *Id.* (quoting *Hines v. State Room, Inc.*, 665 F.3d 235, 241 (1st Cir. 2011) (quoting 29 U.S.C. § 213(a)(1))). Schwan's directs the Court to 29 C.F.R. § 541.200(a)(2)-(3), which defines an "employee employed in a bona fide administrative capacity" as one whose primary duty is "'the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and . . . includes the exercise of discretion and independent judgment with respect to matters of significance.'" *Id.* at 10. Schwan's argues that Mr. Smith was properly exempted from receiving overtime because his "primary duty was the performance of office work directly related to Schwan's general business operations which involved the exercise of discretion and independent judgment." *Id.* (citing 29 C.F.R. § 541.200(a)(2)-(3)).[34]

Beginning with application of 29 C.F.R. § 541.200(a)(2), Schwan's contends that Mr. Smith's work was directly related to Schwan's general business operations, and therefore, he was exempt from receiving overtime. *Id.* According to Schwan's, this is evidenced by his admission that he performed certain duties that meet this standard ("inventory management, fleet management, and facilities management"), and as evidenced by the duties and responsibilities contained in the Position Description (to which Mr. Smith testified during his deposition that the Position Description was "fairly accurate" compared to the duties he actually performed). *Id.*

---

[34] Schwan's points out that Maine courts "look to the federal regulations interpreting the administrative exemption pursuant to the FLSA to define the contours of the administrative exemption pursuant to the Maine overtime statute." *Def.'s Mot.* at 9 (citing *Gordon v. Maine Cent. R.R.*, 657 A.2d 785, 786 (Me. 1995)).

at 11. Schwan's also points to the application and résumé Mr. Smith submitted to SYSCO in which he described his duties and responsibilities as Facility Supervisor. *Id.*

Next, addressing application of 29 C.F.R. § 541.200(a)(3), Schwan's argues that Mr. Smith's work involved the exercise of discretion and independent judgment within the meaning of the federal regulations because

> employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.

*Id.* at 12 (quoting 29 C.F.R. § 541.202(c)). In addition, Schwan's points out that Maine courts recognize that "'[a]n employee does not have to be involved in the formulation of management policies to be an administrative employee.'" *Id.* (quoting *Gordon v. Maine Cent. R.R.*, 657 A.2d 785, 786 (Me. 1995)). Here, Schwan's states that this requirement is met as demonstrated by Mr. Smith's admission that he "effectively managed the warehouse including billing, vendors and maintenance . . . [and] hired, trained and managed new employees." *Id.* Because these two necessary requirements for the Administrative Exemption are met, according to Schwan's, Mr. Smith was properly exempted from receiving overtime. *Id.*

Schwan's also argues that while Mr. Smith may have performed some level of manual work, "[t]he performance of some manual work does not nullify the exempt status of the position when that position's primary duty meets an exemption's standards, as Plaintiff's role as Facility Supervisor did here." *Id.* at 12-13. Citing

*Velazquez-Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 13-14 (1st Cir. 2007), Schwan's argues that one of Mr. Smith's "duties was managing the work of his material handler; such management is an exempt task, and it was being performed even when Plaintiff was both supervising and assisting the material handler in his work." *Id.* at 13. Thus, Schwan's concludes, Mr. Smith's "primary duty was the performance of his non-manual, office work of fleet management, inventory management, and facility management, not the manual work of loading Schwan's delivery trucks. . . . [H]is failure to properly train and manage his Material Handler as required by his job description and multiple supervisors does not transform his position from an exempt to a non-exempt classification." *Id.*

### 2.    Classification as Exempt Employee Under Federal Law Pursuant to the Motor Carrier Act Exemption

Schwan's next argument is that Mr. Smith's "cause of action for violation of FLSA overtime regulations also fails because Facility Supervisors are exempt pursuant to the Motor Carrier Act ("MCA") exemption to the FLSA, 29 U.S.C. § 213(b)(1)." *Id.* at 13-14. Schwan's says that an employee is exempt from overtime requirements with respect to "'whom the Secretary of Transportation has power to establish qualifications and maximum hours of service.'" *Id.* at 14 (quoting 29 U.S.C. § 213(b)(1)). According to Schwan's, § 213(b)(1) sets forth that the "Secretary need not actually regulate a particular employee for the exemption to apply; it must merely possess the power to do so." *Id.* (citing *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 678 (1947)). Therefore, Schwan's contends, whether an employee falls under the MCA Exemption "depends both on the class to which his employer belongs—whether

the employer as a whole is subject to the Secretary's jurisdiction, and on the class of work involved in the employee's job—whether the employee is personally involved in activities that involve the safety of interstate commerce." *Id.* (citing 29 C.F.R. § 782.2(a)).

Beginning with whether it is subject to the Secretary of Transportation's jurisdiction, Schwan's answers in the affirmative. *Id.* at 14-17. Citing 49 U.S.C. §§ 31502(b), 13102(14), 31132(1), Schwan's contends that the Secretary has jurisdiction because it is "engaged in activities 'directly related to the transportation of materials moving in interstate or foreign commerce.'" *Id.* at 14-15 (quoting 29 C.F.R. § 782.7). In addition, Schwan's contends that its delivery trucks meet the definition of "commercial motor vehicle" within the meaning of 49 U.S.C. § 31132(1) because they have a GVWR of at least 10,001 pounds. *Id.* at 15. Schwan's also observes that the "Secretary's jurisdiction over Schwan's has been confirmed by both agencies and courts." *Id.* Specific to Mr. Smith, Schwan's notes that he was "consistently, heavily and continuously regulated by the [DOT] throughout his employment as a Facility Supervisor." *Id.* at 17 (citing numerous documents in Mr. Smith's personnel file).

Schwan's next addresses whether Mr. Smith was personally involved in activities that involved the safety of interstate commerce, and answers in the affirmative. *Id.* at 17-20. Schwan's argues that this requirement has been met because Mr. Smith "engage[d] in an activity that affects motor vehicle safety and . . . within the scope of interstate commerce." *Id.* at 18. Schwan's points to the fact that Mr. Smith "admitted at his deposition that he routinely drove the route delivery

trucks, at least on a weekly basis," and it has been held that driving a delivery truck is the type of act that directly affects safety. *Id.* (citing *Guyton v. Schwan Food Co.*, No. Civ. 03-5523 (DWF/SRN), 2004 U.S. Dist. LEXIS 4174, 2004 WL 533942 (D. Minn. Mar. 16, 2004)). In addition, Schwan's argues that because Mr. Smith "conducted activities on public roads," he was directly engaged in interstate commerce.[35] *Id.* This is true, Schwan's contends, in part, because "he operated vehicles that were used to transport products that were part of a continuous interstate stream of commerce." *Id.* at 19 (citing 29 C.F.R. § 782.7(b)(1); *Morris v. McComb*, 332 U.S. 422, 430 (1947)). Schwan's also argues that Mr. Smith was engaged in interstate commerce based on the "essential character of the shipment" (i.e., based on the overall intent at the time of shipment to circulate product through interstate commerce). *Id.* (quoting *Roberts v. Levine*, 921 F.2d 804, 812 (8th Cir. 1990)). Thus, Schwan's concludes, the MCA Exemption applies to Mr. Smith. *Id.* at 20.

### 3. The Unjust Enrichment Claim

Schwan's concludes by arguing that Mr. Smith's unjust enrichment claim is preempted by his FLSA and Maine overtime statutory claims. *Id.* (citing *Roman v. Maietta Const., Inc.*, 147 F.3d 71, 76 (1st Cir. 1998); *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 55 (1st Cir. 2013)).

---

[35] Schwan's anticipated an argument Mr. Smith did not make. In its motion, Schwan's says that Mr. Smith "may claim that he was not engaged in interstate commerce because he did not travel across state lines pursuant to his duties as a Facility Supervisor." *Def.'s Mot.* at 18-19. However, in his statement of additional material facts, Mr. Smith asserted and Schwan's admitted that as part of his job as Facility Supervisor, he crossed state lines. PSAMF ¶ 48; DRPSAMF ¶ 48 ("As Facility Supervisor, Mr. Smith would occasionally have to drive his personal vehicle out-of-state while performing his job duties; he could be called upon to do this at any time").

## B.  Mr. Smith's Opposition

### 1.  Classification as Exempt Employee Under Maine and Federal Law Pursuant to the Administrative Exemption

Mr. Smith agrees that 29 C.F.R. § 541.200(a)(1)-(3) sets forth the necessary elements Schwan's must prove apply to Mr. Smith to classify him as a bona fide administrative employee, and that the Maine Department of Labor (MDOL) regulations are nearly identical to the federal regulation. *Pl.'s Opp'n* at 4 & n.2. Addressing the question of Mr. Smith's "primary duty" as Facility Supervisor, Mr. Smith directs the Court to 29 C.F.R. § 541.700(a), which defines "primary duty" as the "principal, main, major or most important duty that the employee performs," to be determined based on a list of non-exhaustive factors set forth under the regulation. *Id.* at 5.

Unlike Schwan's, however, Mr. Smith argues that his primary duty was "to work alongside his material handlers to make sure that all of the loads for Schwan's trucks were manually removed from the freezer and loaded onto the trucks in a timely manner, and to otherwise perform the manual labor necessary to ensure that the trucks were properly inventoried, fueled and serviced." *Id.* at 6 (citing PSAMF ¶ 7). Mr. Smith acknowledges that he had "some minimal administrative duties," but argues that "it was much more important to Schwan's management that the trucks be physically loaded on time during the overnight shift so Schwan's drivers could deliver product to its customers during the day." *Id.* (citing PSAMF ¶ 8). Mr. Smith also points to his deposition testimony in which he estimated that "he spent at least eighty percent of his time performing these non-administrative tasks" (i.e., pulling

product from the freezers, loading delivery trucks, cleaning the depot, fueling and checking trucks). *Id.* (citing PSAMF ¶¶ 7, 9, 11). To Mr. Smith's knowledge, no courts have held that an employee's primary duty was management when he or she spent 80 percent or more of the time "performing nonexempt tasks." *Id.* at 7-8 (citing *Williams v. Hooah Sec. Servs. LLC*, No. 09-02376-STA-tmp, 2011 U.S. Dist. LEXIS 133412, 2011 WL 5827250, at *12-13 (W.D. Tenn. Nov. 18, 2011); *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 911-17 (E.D. La. 2009); *McKinney v. United Stor-All Centers LLC*, 656 F. Supp. 2d 114, 122-23 (D.D.C. 2009); *Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp. 2d 273, 275-76 (W.D.N.Y. 2007)).

In addition, Mr. Smith argues that his duties and responsibilities as Facility Supervisor were virtually identical to the Material Handler position, as evidenced by Mr. DeRosie and Mr. Meier's declarations, and by the fact that his annual salary as Facility Supervisor was nearly identical to his gross pay in 2006 and 2007 as a Material Handler. *Id.* at 6-7. Furthermore, Mr. Smith counters Schwan's claim that he had administrative duties involving fleet, inventory, and facility management on the basis that Schwan's "fails to offer any examples setting forth what these duties specifically entailed." *Id.* at 8.

Next, in response to Schwan's citation of *Velazquez-Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 13-14 (1st Cir. 2007) for the proposition that Mr. Smith's performance of some manual labor does not preclude application of the Administrative Exemption, Mr. Smith points out that the appellant's duties in that case were similar to that of an LGM at Schwan's—not a Facility Supervisor. *Id.* at 9. Moreover, Mr. Smith notes

that there were two plaintiffs in the *Velazquez-Fernandez* case—not just the appellant who was denied overtime under the FLSA. *Id.* In fact, the district court denied the employer's motion for summary judgment as to the other plaintiff's FLSA claim because "there was a genuine issue as to whether Velazquez-Fernandez's primary duty at [employer] involved office or non-manual work directly related to management policies or general business operations." *Id.* at 9-10. Mr. Smith further contends that his job duties were "nearly identical" to those described by Velazquez-Fernandez in his affidavit. *Id.* at 10 (citing *Velasquez Fernandez v. NCE Foods, Inc.*, 405 F. Supp. 2d 179, 195 (D.P.R. 2005)).

Moving to whether Mr. Smith's work was directly related to Schwan's management policies or general business operations, Mr. Smith contends it was not. *Id.* at 10-12. He directs the Court to 29 C.F.R. § 541.205(a)-(b), which describes what is meant by the phrase "directly related to management policies or general business operations," *id.* at 10-11, and argues that his primary duty (described above) did not fall within the intent of the regulations. *Id.* at 11.[36]

Furthermore, addressing whether Mr. Smith exercised discretion and independent judgment during his employment as Facility Supervisor, he argues he did not. *Id.* at 12-13. He points to 29 C.F.R. § 541.202, and claims that he was "tightly supervised by Schwan management" and "had little or no discretion with respect to

---

[36]    Although Mr. Smith directs the Court to 29 C.F.R. § 541.205(a)-(b), that section of the federal regulations no longer exists. The Court assumes Mr. Smith meant to cite 29 C.F.R. § 541.201 on this point, which addresses what is meant by "directly related to management or general business operations."

the manner in which [his] job was to be performed." *Id.* at 12 (citing PSAMF ¶ 26).[37]

Mr. Smith cites, among others, PSAMF ¶ 28 to support his claim, in which he

"allegedly deviated from established Schwan policies in loading the trucks, taking

manual inventory or fueling the delivery trucks, [and as a result] he received written

performance warnings from Schwan." *Id.* at 13 (citing 29 C.F.R. § 541.202(b)).

### 2. Classification as Exempt Employee Under Federal Law Pursuant to the Motor Carrier Act Exemption

In response to Schwan's claim that he was properly exempted from receiving

overtime on the basis of the MCA, Mr. Smith counters that he is "entitled to overtime

under both the FLSA and Maine law pursuant to the Small Vehicle Exception to the

MCA, as in performing his job duties as Facility Supervisor, he drove his personal

vehicle weighing less than 10,000 pounds on at least a weekly basis." *Id.* Mr. Smith

begins by observing that while neither the District of Maine nor the First Circuit has

addressed the "recent developments" regarding the MCA Exemption, the District of

Massachusetts has. *Id.* Citing *Brooks v. Halsted Communications, Ltd.*, 620 F. Supp.

2d 193, 197-98 (D. Mass. 2009), Mr. Smith claims that he is not exempted from

overtime under the MCA because the "'exemption [to the FLSA's overtime

requirements] was inapplicable to employees of motor carriers who drove motor

vehicles that weighed 10,000 pounds or less.'" *Id.* at 14 (quoting *Brooks*, 620 F. Supp.

2d at 198). Mr. Smith also cites two field bulletins issued by the United States

---

[37] The Court adjusted the language of PSAMF ¶ 26 in its recitation of the facts. *See supra* note 22.

Department of Labor regarding the Small Vehicle Exception to support his position. *Id.* at 15-16.

In Mr. Smith's view, "it is clear that [he] is entitled to overtime pay under the FLSA, as he drove his personal vehicle with a GVWR of 7,000 pounds every week while employed as Facility Supervisor." *Id.* at 17-18 (citing *Westberry v. William Joule Marine Transp., Inc.*, No. 8:12-cv-486-T-30TGW, 2013 U.S. Dist. LEXIS 24882, 2013 WL 656327, at *4 (M.D. Fla. Feb. 22, 2013); *Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 705 (S.D. Tex. 2012); *Bedoya v. Aventura Limousine & Transp. Serv., Inc.*, No. 11-24432-CIV, 2012 U.S. Dist. LEXIS 128826, 2012 WL 3962935, at *4 (S.D. Fla. Sept. 11, 2012); *Hernandez v. Alpine Logistics, LLC*, No. 08-CV-6254T, 2011 U.S. Dist. LEXIS 96708, 2011 WL 3800031, at *4-5 (W.D.N.Y. Aug. 29, 2011); *Mayan v. Rydbom Express, Inc.*, Civil Action No. 07-2658, 2009 U.S. Dist. LEXIS 90525, 2009 WL 3152136, at *9 (E.D. Pa. Sept. 30, 2009)).

### 3. Preemption

Finally, Mr. Smith counters that according to "well-established principles of law in the First Circuit and the District of Maine, [his] state law claims for unpaid overtime wages are not preempted by the FLSA." *Id.* at 18. Citing *Maccabees Mutual Life Insurance Co. v. Perez-Rosado*, 641 F.2d 45, 46 (1st Cir. 1981), Mr. Smith points out that the "First Circuit held that the FLSA does not expressly preempt state wage and hour law." *Id.* at 19. He also claims that the FLSA does not "implicitly prohibit state regulation." *Id.* In addition, Mr. Smith cites *Bolduc v. National Semiconductor Corp.*, 35 F. Supp. 2d 106, 117 (D. Me. 1998) for the proposition that the "FLSA did

not preempt plaintiff's state law overtime claims pursuant to 26 M.R.S.A. § 664." *Id.* Lastly, in response to Schwan's citation of *Manning v. Boston Medical Center Corp.*, 725 F.3d 34, 55 (1st Cir. 2013), Mr. Smith argues that that case held the opposite of what Schwan's claims—common law claims were not preempted by the Commonwealth's wage and hour statutes. *Id.* at 20 (citing *Manning*, 725 F.3d at 55-56).

### C.    Schwan's Reply

In its reply, Schwan's claims that this case comes down to "two clear issues of law": (1) whether an exempt employee may "ignore directions from his supervisors to perform duties that would make his position properly exempt and then bring suit arguing that he should have been paid as an hourly employee"; and (2) whether that employee may support a suit "with declarations that contradict: (1) his own deposition testimony and (2) statements made by his supervisors during his employment." *Def.'s Reply* at 1.  Not surprisingly, Schwan's answers its own questions in the negative.  *Id.*

Schwan's repeats the proposition that the Administrative Exemption applies to Mr. Smith because he qualified as a bona fide administrative employee.  *Id.* at 2. Schwan's also includes, as it did in DRPSAMF ¶ 25, that Mr. Smith is only now claiming that his résumé was "exaggerated" after verifying during his deposition that the information was "accurate." *Id.* at 3.  Schwan's views this so-called "exaggeration" as the creation of a clear contradiction to his former testimony, which is improper without a "'satisfactory explanation of why the testimony is changed.'"  *Id.* (quoting *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)).  In addition,

in response to Mr. Smith's emphasis on the amount of time he spent performing manual labor, Schwan's counters that it "did not intend for [Mr. Smith] to be doing the manual labor required to make sure the trucks were loaded himself; he was supposed to train and supervise his Material Handler to do the manual work." *Id.* at 4. Thus, Schwan's argues, Mr. Smith's primary duties involved supervising the Material Handlers and performing other administrative duties. *Id.* at 5.

In response to Mr. Smith's argument that the Small Vehicle Exception to the MCA applies, Schwan's states that the cases cited by Mr. Smith are "easily distinguishable." *Id.* at 5-6. According to Schwan's, those cases involved employees who only drove non-commercial vehicles under 10,000 pounds, or "involved employers whose vehicle fleets consisted of both commercial and non-commercial vehicles and whose employees were trained to utilize either type of vehicle owned by their employer." *Id.* at 6.

Finally, regarding its contention that the unjust enrichment claim is preempted by the FLSA and state statutory claims, Schwan's observes that Mr. Smith "mistakenly believe[s] that Schwan's is arguing that his Maine statutory overtime law claims are preempted by the FLSA. This is not the case." *Id.* Instead, Schwan's reiterates its position that the unjust enrichment claim is preempted because it "is based on the same allegations regarding unpaid overtime as his claims under the Maine Overtime Statute and Fair Labor Standards Act." *Id.*

III.     DISCUSSION

A.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the

aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## B. Analysis

There are three issues to resolve on Schwan's motion for summary judgment; whether the facts establish a genuine dispute that: (1) the Administrative Exemption applies to Mr. Smith; (2) the MCA Exemption applies to Mr. Smith; and (3) Mr. Smith's unjust enrichment claim is preempted under federal and state law.

### 1. The Administrative Exemption

The FLSA states, in relevant part, that

> no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of [forty hours] . . . at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). The Maine overtime statute contains a nearly identical provision. *See* 26 M.R.S. § 664(3). There is no dispute that Mr. Smith regularly worked in excess of 40 hours per week during his time as a Facility Supervisor at Schwan's.

Nevertheless, "these overtime compensation provisions do not apply to 'any employee employed in a bona fide . . . administrative . . . capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor])." *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1070 (1st Cir. 1995) (quoting 29 U.S.C. § 213(a)(1)); *Hines*, 665 F.3d at 241. Schwan's bears the burden of establishing that Mr. Smith was properly exempted. *Reich*, 44 F.3d at

1070. The Court's interpretation of the exemption is to be "'narrowly construed against the employer[] seeking to assert [it].'" *McLaughlin v. Boston Harbor Cruise Lines, Inc.*, 419 F.3d 47, 58 (1st Cir. 2005) (Lipez, J., concurring) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)); *see also Sec'y of Labor v. DeSisto*, 929 F.2d 789, 797 (1st Cir. 1991).

In addition, "[w]hether or not a position is exempt from the overtime requirement is a mixed question of law and fact." *Bolduc*, 35 F. Supp. 2d at 114; *see also Reich*, 44 F.3d at 1073. "If there is a genuine dispute of fact that goes to the nature of the job duties, then it is 'for a fact-finder and not the Court to determine how the Plaintiff actually spent her work day.'" *McGowen v. Four Directions Dev. Corp.*, No. 1:12-CV-00109-JAW, 2014 U.S. Dist. LEXIS 30515, at *69, 2014 WL 916366, at *17 (D. Me. Mar. 10, 2014) (quoting *Nicholson v. Bangor Historic Track, Inc.*, No. 2:11-cv-00347-NT, 2013 U.S. Dist. LEXIS 25081, 2013 WL 685337 (D. Me. Feb. 25, 2013)). Thus, whether an employee has been properly placed in exempt status "'remains intensely fact bound and case specific.'" *Bolduc*, 35 F. Supp. 2d at 114 (quoting *Bohn v. Park City Grp., Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996)).

The requirements concerning the Administrative Exemption are not contained in § 213(a)(1). Instead, they are set forth in the regulations established by the Secretary of Labor. The relevant regulation for determining whether an employee has been properly classified under the Administrative Exemption is found in 29 C.F.R. § 541.200(a). Mr. Smith and Schwan's agree that this regulation controls. *See Def.'s Mot.* at 10; *Pl.'s Opp'n* at 4. In addition, Maine courts use federal regulations,

such as the one applicable in this case, to construe 26 M.R.S. § 664. *See Gordon*, 657 A.2d at 786.

Under 29 C.F.R. § 541.200(a), an "employee employed in a bona fide administrative capacity" means any employee:

(1)     Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2)     Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3)     Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1)-(3).[38] The crux of the argument is whether Mr. Smith's "primary duty" was the performance of office or non-manual work directly related to the management or general business operations of Schwan's or its customers, including the exercise of discretion and independent judgment with respect to matters of significance. *Id.* § 541.200(a)(2)-(3).

a.     **Michael Smith's "Primary Duty"**

The Court begins by addressing whether there is a genuine dispute of material fact as to whether Mr. Smith's primary duty was the performance of administrative work directly related to the management or general business operations of Schwan's. Federal regulations provide guidance as to the definition of "primary duty":

---

[38]     Schwan's notes that Mr. Smith "does not dispute that he was paid a salary that met the salary basis test in § 541.200(a)(1) or 26 M.R.S.A. § 663(k)." *Def.'s Mot.* at 10. The record establishes that Mr. Smith received a salary base greater than $455 per week so this requirement is satisfied. PSAMF ¶ 34; DRPSAMF ¶ 34.

(a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

(b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

*Id.* § 541.700(a)-(b). Schwan's argues that while Mr. Smith performed some level of manual work by loading delivery trucks, Mr. Smith's primary duty was administrative work, as demonstrated by, among other things, (1) his "inventory management, fleet management, and facilities management"; (2) the Position Description; (3) his SYSCO application and résumé; and (4) his "managing the work of his material handler; such management is an exempt task, and it was being performed even when Plaintiff was both supervising and assisting the material handler in his work." *Def.'s Mot.* at 11, 13. Mr. Smith acknowledges that he had "some minimal administrative duties," but that "it was much more important to Schwan's management that the trucks be physically loaded on time during the

overnight shift so Schwan's drivers could deliver product to its customers during the day." *Pl.'s Opp'n* at 6. He also points out that he estimated during his deposition that he spent approximately 80 percent of his time performing manual work, including pulling products from the freezer, loading delivery trucks, cleaning the depot, and fueling and checking trucks. *Id.*

The record, viewed in the light most favorable to Mr. Smith, contains sufficient evidence from which a reasonable jury could find that Mr. Smith's primary duty was the performance of manual as opposed to administrative work. The list of non-exhaustive factors contained in § 541.700(a) is instructive, keeping in mind that the "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).

First, "primary duty" is defined as "the principal, main, major or most important duty that the employee performs." *Id.* In this case, the record establishes the following: Mr. Meier expected Mr. Smith first and foremost to work alongside his Material Handlers to make sure that all of the loads for Schwan's trucks were manually removed from the freezer and loaded onto the trucks in a timely manner, and to otherwise perform the manual labor necessary to ensure the trucks were properly inventoried, fueled and serviced. PSAMF ¶ 7; DRPSAMF ¶ 7. Although Mr. Smith had some administrative duties, it was much more important to Mr. Meier that the trucks be physically loaded on time during the overnight shift to ensure delivery to customers during the daytime. PSAMF ¶ 8; DRPSAMF ¶ 8. Furthermore,

Mr. Meier expected Mr. Smith to spend at least 80 to 85 percent of his time (1) pulling product from the freezers; (2) loading the delivery trucks with the product pulled from the freezers; (3) cleaning the depot; (4) fueling the trucks and otherwise checking the trucks to make sure they were ready to go in the morning; and (5) performing other manual tasks around the Gorham depot. PSAMF ¶ 9; DRPSAMF ¶ 9. Thus, the record could lead a reasonable jury to find that Mr. Smith's primary duty was not administrative.

Second, "the relative importance of the exempt duties as compared with other types of duties" is a relevant factor. 29 C.F.R. § 541.700(a). Here, as discussed above, the record establishes that it was much more important to Mr. Meier that the trucks be physically loaded on time during the overnight shift, and that Mr. Meier expected Mr. Smith to work 80 to 85 percent of his time performing manual work. PSAMF ¶¶ 8-9; DRPSAMF ¶¶ 8-9. Although the evidence also establishes that his superiors instructed Mr. Smith to perform more administrative tasks than he was doing, *see* Section I.B.7, *supra*, balancing the significance of this fact among others is the job of a fact-finder.

Third, "the amount of time spent performing exempt work" is another relevant factor. 29 C.F.R. § 541.700(a). The regulation cautions that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id.* § 541.700(b). In this case, the record establishes that

Mr. Smith spent approximately 80 to 85 percent of his time performing manual work, which leads to the assumption that he spent approximately 15 to 20 percent of his time performing administrative or office work. Although the amount of time spent on exempt work is not determinative, when considered in connection with other factors, a reasonable jury could find this factor in Mr. Smith's favor.

Mr. Smith cites a number of cases for the proposition that no court has ever found an employee's primary duty to be administrative when he or she spent 80 percent or more of the time "performing nonexempt tasks." *Pl.'s Opp'n* at 7. The Court agrees the cases cited by Mr. Smith support his proposition. *Williams*, 2011 U.S. Dist. LEXIS 133412, at *37, 2011 WL 5827250, at *12 (Defendants did not dispute that Plaintiff spent "about 20% of his time performing managerial functions for Defendants. As such, his 'primary duty' was not directly related to management policies, and he cannot satisfy the second prong of the bona fide administrative employee exemption"); *Johnson*, 604 F. Supp. 2d at 912-13 ("No circuit courts have found management was a primary duty when the employee spent 80 to 90% of his time performing nonexempt tasks"); *McKinney*, 656 F. Supp. 2d at 124-25 (denying summary judgment when, among other reasons, plaintiffs "asserted that they devoted eighty to ninety percent of their work time to . . . tasks unrelated to management or general business operations . . . . These assertions, supported by the plaintiffs' sworn testimony . . . must be accepted on summary judgment"); *Rubery*, 470 F. Supp. 2d at 277 (denying summary judgment when, among other reasons,

plaintiff claimed that she spent approximately 90 percent of her time doing the same work as the "lowest employees at the store").

Fourth, "the employee's relative freedom from direct supervision" is a relevant factor. 29 C.F.R. § 541.700(a). A reasonable jury could find that Mr. Smith's freedom from direct supervision was restricted; the Court cites examples from the record in more detail below in its analysis of 29 C.F.R. § 541.200(a)(3). Section III.B.1.b, *infra*.

Fifth, "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee" is a relevant factor. 29 C.F.R. § 541.700(a). Here, the record establishes that while employed as a Material Handler in 2005, Mr. Smith's gross pay was $31,603.69; in 2006, $36,018.43; and in 2007, through June 9, 2007, $19,682.59. PSAMF ¶ 33; DRPSAMF ¶ 33. The record further demonstrates that when Mr. Smith became a Facility Supervisor, from June 10, 2007 through March 2, 2008, Mr. Smith was paid a salary of $37,500.00 per year. PSAMF ¶ 34; DRPSAMF ¶ 34. On March 2, 2008, he received a two percent raise to $38,250.00 per year. *Id.* Once again, a reasonable jury could find that the similarities in annual pay between the hourly position of Material Handler and the salary position of Facility Supervisor support Mr. Smith's contention.

To support its argument, Schwan's also points to the Position Description and Mr. Smith's deposition testimony in which he stated that the Position Description was "fairly accurate" compared to the duties he actually performed. *Def.'s Mot.* at 11. However, the Position Description alone and Mr. Smith's general statement during

his deposition are insufficient to require a legal conclusion regarding exemption under the FLSA. *See Bolduc*, 35 F. Supp. 2d at 115 ("The statements made by [plaintiff] in his deposition are conclusory and general and do not describe [his] specific job duties so that a judgment may be made whether he was exempt from the overtime provisions of the FLSA as a matter of law"); *Berg v. Newman*, 982 F.2d 500, 503 (Fed. Cir. 1992) (reasoning that a job description describing general requirements of plaintiffs' position and other conclusory statements are insufficient for a court to make a legal conclusion regarding exemption under the FLSA). Plus, there is also record evidence by which a reasonable jury could find that Mr. Smith did not have all of the duties and responsibilities listed in the Position Description. *See, e.g.*, PSAMF ¶ 21; DRPSAMF ¶ 21 (Mr. Smith's deposition testimony).

Schwan's also cites the First Circuit's *Velazquez-Fernandez* decision. In that case, Mr. Rivera was found to be an exempt executive employee. *Velazquez-Fernandez*, 476 F.3d at 13. Mr. Rivera was "in charge of the warehouse," and he "admitted to supervising his fellow warehouse employees, ranging in number from six to nine workers." *Id.* at 14. Mr. Rivera claimed that "because he also performed clerical and manual duties he should be considered a non-exempt employee," but the First Circuit concluded that his duties were still managerial. *Id.* In response, Mr. Smith directs the Court to the lower court opinion in *Velazquez-Fernandez* as being more instructive and similar to the facts of this case. *Pl.'s Opp'n* at 9-10.

The Court agrees with Mr. Smith. The district court held that one of the plaintiffs, Nelson Velazquez-Fernandez, presented a genuine issue as to whether his

primary duty was administrative in nature. *Velazquez Fernandez*, 405 F. Supp. 2d at 195. This part of the district court's ruling was not appealed to the First Circuit. The district court found that Mr. Velazquez-Fernandez would run the warehouse's operations whenever Mr. Rivera was not present. *Id.* Despite this administrative task, the district court explained other manual duties that Mr. Velazquez-Fernandez was responsible for:

> Velázquez's affidavit states that he also performed manual duties, such as unloading trailers, loading trucks, receiving orders, dispatching orders, taking orders over the phone, data entry duties regarding the inventory system, substituting the drivers when they were absent, cleaning the warehouse and trucks, and changing the oil and filters of the trucks. No. 33. The affidavit further states that such manual duties represented ninety-five percent of his work time. No. 33. On these facts the Court holds a reasonable jury could find that Velázquez's administrative functions were not his primary duty at NCE Foods, and therefore the Defendants are not entitled to summary judgment on Velázquez's FLSA claim.

*Id.* Mr. Smith's case presents similar facts. For instance, the record establishes that he would only make transfers or "forecasts" when directed by an LGM or supervisor. PSAMF ¶ 17; DRPSAMF ¶ 17. In addition, many of the manual tasks described in Mr. Velasquez-Fernandez's affidavit are similar to the manual tasks described by Mr. Smith in his declaration and deposition. *See generally* Section I.B.3, *supra*.

In the Court's view, there is a genuine dispute of material fact as to whether Mr. Smith's primary duty was administrative.

### b.    Discretion and Independent Judgment

Although the record creates a genuine dispute of material fact as to whether Mr. Smith's primary duty was administrative, the Court briefly considers whether

there is a genuine dispute of material fact as to whether his primary duty included "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3).

Federal regulations provide guidance as to the definition of "discretion and independent judgment":

> (a) To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval . . .

> (c) . . . employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.

*Id.* § 541.202(a)-(c). The only evidence Schwan's cites to support its contention that Mr. Smith's primary duty included the exercise of discretion and independent judgment is his admission that he "effectively managed the warehouse including billing, vendors and maintenance . . . [and] hired, trained and managed new employees." *Def.'s Mot.* at 12. Mr. Smith counters that he had no such discretion or

independence, because he received written performance warnings from Schwan's after allegedly deviating from policies and procedures involving the delivery trucks. *Pl.'s Opp'n* at 13 (citing PSAMF ¶ 28).

Two contrasting cases from this District are instructive. In *Bolduc*, the Court found that the evidence supported a "general proposition" that the plaintiff "supervised the projects assigned to him . . . and had authority to purchase materials and set a budget for the projects he managed." 35 F. Supp. 2d at 115. Nevertheless, the *Bolduc* Court found the evidence "lack[ed] the specificity that would compel a finding that [the plaintiff] used discretion in his day-to-day activities" as manager. *Id.* In addition, plaintiff's deposition testimony was "conclusory and general" and did not "describe [his] specific job duties so that a judgment may be made whether he was exempt." *Id.*

In contrast, this Court recently held in *McGowen* that the "summary judgment record is both sufficiently specific and sufficiently undisputed to support judgment as a matter of law on the duties test for the administrative exemption." 2014 U.S. Dist. LEXIS 30515, at *72, 2014 WL 916366, at *18. This Court cited numerous facts, including (1) Ms. McGowen's deposition testimony in which she acknowledged that the job description was an "accurate summary" of her job duties; (2) the parties' agreement that she exercised discretion and independent judgment in her job; (3) the fact that "her discretion was subject to . . . supervisory review does not make it less discretionary"; and (4) numerous specific examples from the record describing Ms. McGowen's day-to-day tasks. 2014 U.S. Dist. LEXIS 30515, at *72-76, 2014 WL

916366, at *18-19. This Court also noted the case was not one "where there are outstanding disputed facts that would preclude summary judgment." 2014 U.S. Dist. LEXIS 30515, at *74, 2014 WL 916366, at *19.

The Court views Mr. Smith's case as more like *Bolduc* than *McGowen*. Similar to *Bolduc*, where Judge Carter found that the evidence lacked specificity even when the record established that the plaintiff supervised projects assigned to him and had authority to spend and set a budget, Mr. Smith's admission that he "effectively managed the warehouse including billing, vendors and maintenance . . . [and] hired, trained and managed new employees" lacks the necessary specificity.

Although Mr. Smith testified during his deposition that the duties and responsibilities contained in the Position Description were "fairly accurate"—a similar statement to Ms. McGowen's testimony—there are key differences with *McGowen*. First, Schwan's and Mr. Smith dispute whether he exercised discretion and independent judgment in his job. Second, the record establishes that Mr. Smith was not permitted to create, alter, interpret or implement new management policies or operating practices, nor did he have the authority to deviate from Schwan's established policies and procedures without prior approval from one of his managers. PSAMF ¶ 27; DRPSAMF ¶ 27. Third, Mr. Smith's discretion was limited in how he performed his job—specifically, at a minimum, Schwan's dictated which trucks were to be loaded, the time at which all trucks needed to be loaded each morning, how often the trucks were to be inventoried, the manner in which the trucks were to be fueled

and maintained, and the manner in which the depot was to be maintained. PSAMF ¶¶ 26, 28; DRPSAMF ¶¶ 26, 28; *see also* 29 C.F.R. § 541.202(b).

### c. Conclusion as to Administrative Exemption

In summary, the Court finds that a genuine dispute of material fact exists as to whether the Administrative Exemption applies to Mr. Smith. Schwan's motion for summary judgment on this point must fail.

### 2. The Motor Carrier Act Exemption

The overtime compensation provisions contained in 29 U.S.C. § 207(a)(1) also do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." 29 U.S.C. § 213(b)(1) (MCA). Once again, as with the Administrative Exemption, Schwan's bears the burden of establishing that Mr. Smith was properly exempted under the MCA, and the Court's interpretation of the exemption is to be "'narrowly construed against the employer[] seeking to assert [it].'" *De Jesus-Rentas v. Baxter Pharmacy Servs. Corp.*, 400 F.3d 72, 74 (1st Cir. 2005) (quoting *Reich*, 44 F.3d at 1070). In addition, "[w]hether or not a position is exempt from the overtime requirement is a mixed question of law and fact." *Bolduc*, 35 F. Supp. 2d at 114; *see also Reich*, 44 F.3d at 1073.

The MCA Exemption depends only upon the existence of the Secretary of Transportation's power to establish maximum hours of service; the Secretary need not actually exercise such power. *Levinson*, 330 U.S. at 678; *Morris*, 332 U.S. at 434. The Secretary may "prescribe requirements for . . . qualifications and maximum

hours of service of employees of, and safety of operation and equipment of, a motor carrier . . . when needed to promote safety of operation." 49 U.S.C. § 31502(b). Prior to 2005, a "motor carrier" was defined as "a person providing motor vehicle transportation for compensation." *Id.* § 13102(14) (2002) (amended 2005 and restored 2008). "The effect of the pre-2005 definition of 'motor carrier' was to exempt all drivers employed by motor carriers, regardless of the weight of their vehicles, from the overtime provisions of the FLSA." *Brooks*, 620 F. Supp. 2d at 197.

In 2005, Congress amended the definition of "motor carrier" when it passed an appropriations bill entitled, "Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users or 'SAFETEA-LU'" (SAFETEA-LU). Pub. L. No. 109-59, § 4142, 119 Stat. 1144, 1747 (2005). Under SAFETEA-LU, the term "motor vehicle" was replaced with the term "commercial motor vehicle" under the definition of "motor carrier." *Id.*; *Brooks*, 620 F. Supp. 2d at 197. A "commercial motor vehicle" is one that has a GVWR of or weighs at least 10,001 pounds. 49 U.S.C. § 31132(1)(A). Thus, after passage of SAFETEA-LU, employers operating vehicles weighing 10,000 pounds or less no longer could claim MCA exemption.

In 2008, Congress restored the pre-SAFETEA-LU definition of "motor carrier" after passage of the SAFETEA-LU Technical Corrections Act (TCA). Pub. L. No. 110-244, § 305, 122 Stat. 1572, 1620 (2008). However, Congress also extended overtime protections, notwithstanding the MCA Exemption, to a "covered employee." *Id.* § 306(a). A "covered employee" is defined as an employee:

(1) who is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);

(2) whose work, in whole or in part, is defined—
(A) as that of a driver, driver's helper, loader or mechanic; and
(B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles—

(i) designed or used to transport more than 8 passengers (including the driver) for compensation;

(ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or

(iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code . . . and

(3) who performs duties on motor vehicles weighing 10,000 pounds or less.

*Id.* § 306(c) (Small Vehicle Exception). Thus, as the *Brooks* Court observed (notwithstanding some limited exceptions), "the TCA reconfirmed that the MCA exemption was inapplicable to employees of motor carriers who drove motor vehicles that weighed 10,000 pounds or less." 620 F. Supp. 2d at 198.

Turning to the facts of this case, the issue narrows to whether Mr. Smith is a "covered employee" as defined under the TCA, thereby making the MCA Exemption inapplicable to him. The record establishes the following: (1) the personal vehicle used by Mr. Smith to perform work-related tasks at Schwan's was a 2007 Chevy Silverado, PSAMF ¶ 48; DRPSAMF ¶ 48; (2) this vehicle had a GVWR of 7,000 pounds, and was not designed or used to transport more than eight passengers, nor was it used to transport hazardous materials for Schwan's, *id.*; (3) as Facility Supervisor, Mr. Smith would occasionally have to drive his personal vehicle out-of-

state while performing his job duties and he could be called upon to do this at any time, *id.*; (4) based on their personal observations, both Mr. Meier and Mr. DeRosie attest that Mr. Smith frequently drove his personal vehicle to perform his job duties as Facility Supervisor, PSAMF ¶ 42; DRPSAMF ¶ 42; and (5) Mr. Meier estimates that Mr. Smith used his personal vehicle to perform work-related tasks at least once per week during his time as Facility Supervisor, and as LGM, Mr. Meier approved the use of Mr. Smith's personal vehicle for work-related tasks, in part, because it was cheaper for the company rather than having Mr. Smith take one of the company's delivery trucks. PSAMF ¶ 43; DRPSAMF ¶ 43.

Mr. Smith argues that "it is clear that [he] is entitled to overtime pay under the FLSA, as he drove his personal vehicle with a GVWR of 7,000 pounds every week while employed as Facility Supervisor." *Pl.'s Opp'n* at 17 (citing numerous cases in support of his position). Schwan's counters that the cases relied upon by Mr. Smith are "easily distinguishable," *Def.'s Reply* at 5-6, because those cases involved employees who only drove non-commercial vehicles under 10,000 pounds, or "involved employers whose vehicle fleets consisted of both commercial and non-commercial vehicles and whose employees were trained to utilize either type of vehicle owned by their employer." *Id.* at 6.

Federal courts have taken an inconsistent approach in answering the question of whether the MCA Exemption applies to an employee who drives both exempt and non-exempt vehicles—referred to by some courts as "mixed activities." Some have held that employees who participate in mixed activities are subject to the MCA

Exemption. *See, e.g.*, *Hernandez v. Brink's, Inc.*, No. 08-20717-CIV, 2009 U.S. Dist. LEXIS 2726, at *15-16, 2009 WL 113406, at *6 (S.D. Fla. Jan. 15, 2009) ("Reverting to the principle derived from regulations governing mixed duties, when mixed activities occur, the Motor Carrier Act favors coverage of the employee during the course of employment"); *Dalton v. Sabo, Inc.*, Civ. No. 09-358-AA, 2010 U.S. Dist. LEXIS 32472, at *10-11, 2010 WL 1325613, at *4 (D. Or. Apr. 1, 2010) (holding that the MCA Exemption applied because "even if each of these plaintiffs occasionally performed duties on vehicles weighing 10,000 pounds or less, 'when mixed activities occur, the Motor Carrier Act favors coverage of the employee during the course of employment'") (quoting *Hernandez*, 2009 WL 113406, at *6)).

Others have held that employees who participate in mixed activities are not subject to the MCA Exemption. *See, e.g.*, *Mayan*, 2009 U.S. Dist. LEXIS 90525, at *31, 2009 WL 3152136, at *9 ("Section 306(c) [of the TCA] clearly states that the employee's work need only 'in whole or in part' affect the safety of operation of vehicles weighing 10,000 pounds or less. An employee working on a 10,001 pound vehicle two days a week and a 5,000 pound vehicle the remaining days of the week appears to satisfy this requirement. In short, the employees must simply perform *some* work on such vehicles" (emphasis in original)); *Hernandez*, 2011 U.S. Dist. LEXIS 96708, at *13, 2011 WL 3800031, at *5 (relying on the text of § 306(c) of the TCA and holding that the "uncontroverted evidence reveals that although some of the plaintiffs occasionally drove larger trucks, the majority of driving hours were spent driving vehicles weighing less than 10,000 pounds").

Despite the inconsistency in caselaw, the United States Department of Labor (DOL) has issued guidance to assist interpreting the Small Vehicle Exception in the "mixed activities" situation. In a fact sheet issued in November 2009, the DOL stated that the MCA shall "not apply to an employee in such work weeks [that § 306(c) applies] even though the employee's duties may also affect the safety of operation of motor vehicles weighing greater than 10,000 pounds . . . in the same work week." *Fact Sheet #19: The Motor Carrier Exemption under the Fair Labor Standards Act (FLSA)*, U.S. DEP'T OF LABOR: WAGE AND HOUR DIV. (Nov. 2009), http://www.dol.gov/whd/regs/compliance/whdfs19.pdf. In other words, "even in weeks where employees worked on vehicles weighing more than 10,000 pounds (and thus were subject to [DOT] regulations), those employees would still be entitled to overtime if they worked on vehicles weighing less than 10,000 pounds." *Hernandez*, 2011 U.S. Dist. LEXIS 96708, at *15, 2011 WL 3800031, at *5 (interpreting the Fact Sheet statement). Subsequently, in a field assistance bulletin issued in 2010, the DOL gave similar guidance. *See Field Assistance Bulletin No. 2010-2*, U.S. DEP'T OF LABOR: WAGE AND HOUR DIV. (Nov. 4, 2010), http://www.dol.gov/whd/FieldBulletins/fab2010_2.htm (explaining in section E. of an included chart that an employee who works on both a motor vehicle weighing 10,001 pounds or more and a motor vehicle weighing 10,000 pounds or less in the same workweek is nonexempt during those workweeks).

Finally, federal regulations also offer general guidance regarding the MCA. "In determining whether an employee falls within [the MCA Exemption], neither the

name given to his position nor that given to the work that he does is controlling; what is controlling is the character of the activities involved in the performance of his job." 29 C.F.R. § 782.2(b)(2) (citations omitted). The regulation goes on to state a "general rule":

> [I]f the bona fide duties of the job performed by the employee are in fact such that he is . . . called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities of the character described in paragraph (b)(2) of this section, he comes within the exemption in all workweeks when he is employed at such job. . . .[T]he rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation." On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no change in his duties.

*Id.* § 782.2(b)(3).

Having considered the various guiding posts in connection with the facts in Mr. Smith's case, the Court finds there is insufficient record evidence upon which it can decide, as a matter of law, whether the MCA Exemption applies to him. For example, Mr. Smith drove the trucks on an approximately weekly basis to understand driver complaints. DSMF ¶ 25; PRDSMF ¶ 25. In addition, he provided road tests as a field trainer to Schwan's drivers in the delivery vehicles. DSMF ¶ 24; PRDSMF ¶ 24. This equivocal evidence is not enough to draw a legal conclusion.

Furthermore, Mr. Meier estimates that Mr. Smith used his personal vehicle to perform work-related tasks at least once per week, PSAMF ¶ 43; DRPSAMF ¶ 43, and Mr. Smith would occasionally have to drive his personal vehicle out-of-state while

performing his job duties and he could be called upon to do this at any time. PSAMF ¶ 48; DRPSAMF ¶ 48. This is also not enough evidence for the Court to draw a legal conclusion. As the *Mayan* Court explained regarding the Small Vehicle Exception, the court's ruling did "not mean that *any* iota of work will defeat an employee's exemption. Each employee's work hours and duties must be considered to ensure that his work with motor vehicles weighing 10,000 pounds or less is more than *de minimis*." 2009 U.S. Dist. LEXIS 90525, at *31 n.12, 2009 WL 3152136, at *9 n.12 (emphasis in original). It is unclear whether Mr. Smith's use of his personal vehicle was de minimis.

In summary, the Court concludes that there remains a genuine dispute of material fact as to whether the MCA Exemption applies to Mr. Smith. Therefore, Schwan's motion for summary judgment on this point must fail.

### 3. The Unjust Enrichment Claim

Finally, the Court must resolve whether Mr. Smith's unjust enrichment claim is preempted by the FLSA and/or the Maine overtime statute. Schwan's claims that it is preempted because it "is based on the same allegations regarding unpaid overtime as his claims under the Maine Overtime Statute and Fair Labor Standards Act." *Def.'s Reply* at 6. In support, Schwan's cites *Roman v. Maietta Construction, Inc.*, 147 F.3d 71, 76 (1st Cir. 1998) and *Manning v. Boston Medical Center Corp.*, 725 F.3d 34, 55 (1st Cir. 2013). *Def.'s Mot.* at 20. In response, Mr. Smith argues, among other things, that *Manning* held the opposite of what Schwan's claims—common law

claims are not preempted by the Massachusetts wage and hour statute. *Pl.'s Opp'n* at 20.

The *Roman* Court stated:

> Román argues that the trial court erred in failing to grant him the remedies set forth in 26 M.R.S. § 626–A for Maietta's violation of § 621 of that statute. We disagree. As the trial court noted, "the FLSA is the exclusive remedy for enforcement of rights created under the FLSA." *Roman,* No. 96–256, slip op. at 7 (citing *Tombrello v. USX Corp.,* 763 F. Supp. 541, 544 (N.D. Ala. 1991)). That is, "the plaintiff cannot circumvent the exclusive remedy prescribed by Congress by asserting equivalent state claims in addition to the FLSA claim." *Tombrello,* 763 F. Supp. at 545.

> Román contends that his claim for relief under § 621(1) has no FLSA equivalent. However, our review of the complaint as well as the record shows that Román never raised a claim under that subsection. Instead, Román sought relief under both the FLSA and 26 M.R.S. §§ 664 and 670 for minimum wage and overtime pay violations. Since Román received compensation under the FLSA for his claims, he cannot recover again under Maine law.

147 F.3d at 76. The *Bolduc* Court explained that the *Roman* Court's ruling stands for the proposition that a "plaintiff is not entitled to a double recovery when he pleads both federal and state claims for the same overtime pay." *Bolduc*, 35 F. Supp. 2d at 117. Thus, the *Bolduc* Court suggests that *Roman* never held, as Schwan's contends it did, that a "plaintiff who brings claims under the Maine Overtime Statute and Fair Labor Standards Act for minimum wage and overtime violations cannot bring additional state law claims for those same violations." *Def.'s Mot.* at 20. In fact, "parties are entitled to pursue claims under both state and federal law to vindicate the same right unless the federal law preempts the state claim." *Bolduc*, 35 F. Supp. 2d at 117; *see also McCormick v. Festiva Dev. Group, LLC*, Civil No. 09-365-P-S, 2010

68

U.S. Dist. LEXIS 14856, at *28, 2010 WL 582218, at *8 (D. Me. Feb. 11, 2010), *aff'd*,

2010 U.S. Dist. LEXIS 25837, 2010 WL 1064668 (D. Me. Mar. 18, 2010) (explaining

that *Bolduc* held that the "FLSA does not preempt even identical state claims").

In 2013, the *Manning* Court addressed *Roman* briefly, but never expressly

clarified the holding because the issue was not brought on appeal. *Manning*, 725 F.3d

at 55.[39] *Manning* held, as Mr. Smith points out, that common law claims are not

preempted by Massachusetts statutory wage and hour law. *Id.* at 55-56. In coming

to this conclusion, the *Manning* Court explained that the "Massachusetts courts have

been clear that 'an existing common law remedy is not to be taken away by statute

unless by direct enactment or necessary implication.'" *Id.* at 56 (quoting *Eyssi v. City

of Lawrence*, 618 N.E.2d 1358, 1361 (Mass. 1993)). However, *Manning* addressed

Massachusetts, not Maine law. Schwan's has not provided any authority suggesting

that the Maine overtime statute preempts Mr. Smith's unjust enrichment claim.[40]

---

[39]     *Manning* explained:

> To clarify the scope of this appeal, the district court ruled that insofar as these common law claims [including unjust enrichment] sought to recover overtime pay, they were preempted because they conflicted with the FLSA's comprehensive remedial scheme. *Cf. Roman*, 147 F.3d at 76 (addressing preemption of Maine law and suggesting that "the FLSA is the exclusive remedy for enforcement of rights created under the FLSA") (internal quotation marks omitted). The parties do not dispute this proposition. McCarthy's state law claims are accordingly limited to the recovery of "straight-time" pay, i.e., unpaid wages for non-overtime hours at her regular hourly rate.

725 F.3d at 55.

[40]     Although not addressed by the parties, in *Dinan v. Alpha Networks Inc.*, 2013 ME 22, ¶ 2, 60 A.3d 792, the Maine Supreme Judicial Court concluded that a demand for wages under Maine's Timely and Full Payment of Wages Law included a demand for payment under quasi-contract. Mr. Smith is proceeding under unjust enrichment, not quasi-contract, and the two legal theories are distinct. *Cummings v. Bean*, 2004 ME 93, ¶ 9, 853 A.2d 221. Nevertheless, as in *Dinan*, it may be that the statutory causes of action are broad enough to encompass a claim of unjust enrichment.

The Court concludes that Mr. Smith's unjust enrichment claim is not preempted, and Schwan's motion for summary judgment on this point must fail.

## IV. CONCLUSION

The Court DENIES Schwan's Home Service, Inc.'s Motion for Summary Judgment (ECF No. 25).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th day of November, 2014